OLIVER P. JEWELL v. THE TERRITORY OF OKLAHOMA.

1. INDICTMENT FOR MURDER — *Insufficient, When.*  An indictment which fails to charge that the homicidal act was perpetrated with a premeditated design to effect the death of the person killed,'or of some other person, does not charge the crime of murder as defined in the first subdivision of § 2078, Statutes of Oklahoma, 1893.

2. SAME—*Common Law Charge—Not Sufficient.*  The ordinary common law charge of murder in an indictment is not sufficient to support a verdict and judgment for murder under the first subdivision of § 2078, defining murder.

3. SAME.  The charge that the shot which caused the death of the deceased was fired "feloniously, wilfully, and with premeditated malice aforethought," is not equivalent to the allegation that the fatal shot was fired "with the premeditated design to effect the death of the person killed."

4. SAME—*Must Fully Charge the Crime.*  An indictment must fully charge the crime and set out all that the law requires to be proved.  And want of averment cannot be supplied by an independent finding of fact not alleged in the indictment.

5. MURDER—*Material Elements to Constitute.*  The material element necessary to constitute murder, under the first subdivision, is the "premeditated design to effect death," and must be alleged and proved as an independent fact, otherwise the killing is only manslaughter, unless it comes within one of the other definitions of murder as contained in the second and third subdivision.

6. HOMICIDE—*Law Defined—Proof.*  Homicide is murder under the second subdivision "when perpetrated by any act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without

any premeditated design to effect the death of any particular individual." And the homicidal act must be one imminently dangerous to more than the the person killed. The class of persons intended to be embraced in this subdivision are such as where the acts by which the homicide is committed are directed against no particular person, but against a number of persons generally, or where the act is imminently dangerous to a number of persons but directed against none, and in either case, without any premeditated design to effect the death of any particular person. Proof of the felonious killing of a particular person by an assault directed specifically at the person killed, will not support a judgment for murder under said second subdivision.

7. SAME. Homicide is murder under the third subdivision "when perpetrated without any design to effect death, by a person engaged in the commission of any felony." And this means some felony as defined by statute other than that of the killing itself.

8. SAME. All other classes of homicide are manslaughter, unless justifiable or excusable.

9. CONVICTION UNDER SUFFICIENT INDICTMENT. The indictment charges that the prisoner unlawfully, feloniously, wilfully, and with premeditated malice aforethought, fired the fatal shot which resulted in the death of the deceased. The verdict was guilty of murder, and sentence of death. *Held*, the indictment is not sufficient to charge murder under subdivision one, defining murder; for the reason that it is not alleged that the fatal shot was fired with the premeditated design to effect the death of the deceased, and that the verdict and judgment can not be sustained under the second subdivision; for the reason that it does not appear that the homicidal act was dangerous to any person other than the deceased, or that it was perpetrated with a general deadly intent, regardless of human life.

10. COMMON LAW RULE CHANGED BY STATUTE. While a count in an indictment may contain a good common law charge of murder, it is not sufficient under the first subdivision of murder defined in Oklahoma Statutes; yet, as every common law charge of murder embraces some one of the grades of manslaughter, such indictment is good on demurrer.

*Error from the District Court of Woodward County.*

*R. J. Ray* for plaintiff in error.

*C. A. Galbraith, Attorney General,* and *B. B. Smith,* for the territory.

The opinion of the court was delivered by

BURFORD, J.:  The appellant was tried in the district court of Woodward county for the murder of one James

McGuinn, in the month of October, 1894. The jury returned a verdict of guilty of murder and assessed the punishment at death. Motions for new trial and in arrest of judgment were made and overruled, and the court sentenced the appellant to be hanged. Appeal was prayed and execution of sentence stayed pending appeal.

The indictment is in three counts, and in order to a better understanding of the questions herein involved, we set out the same in full, as follows:

" United States of America, County of Woodward, Territory of Oklahoma, ss: .

" In the District Court of the Fifth Judicial District, in and for the County of Woodward and Territory of Oklahoma, at the December term thereof, begun and held on the fourth day of December, in the year of our Lord one thousand eight hundred and ninety-four, in the city of Woodward and Territory of Oklahoma.

"The Territory of Oklahoma, Plaintiff, v. Oliver P. Jewell, Defendant.

" INDICTMENT FOR MURDER.

" First count. The grand jurors duly summoned from the body of Woodward county and territory of Oklahoma, chosen, examined, selected, empanneled, sworn and charged in and for the county and Territory aforesaid, to inquire into and true presentment make of crimes and offenses committed in the county and territory aforesaid, on their oaths do find and present:

"That one, Oliver P. Jewell, late of the county and territory aforesaid, and on the twenty-ninth day of October, A. D. 1894, then and there being, with force and arms in the county and territory aforesaid, in and upon the body of one, James McGuinn, in the peace of the territory then and there being, feloniously, wilfully, premeditatedly and of his malice aforethought, did make an assault; and that the said Oliver P. Jewell

a certain pistol then and there charged with gunpowder and leaden bullets, which said pistol he, the said Oliver P. Jewell, in his right hand then and there held, and then and there feloniously, wilfully, premeditatedly and of his malice aforethought did discharge and shoot off, to, against and upon the said James McGuinn, and that the said Oliver P Jewell, with one of the leaden bullets aforesaid, out of the pistol aforesaid, then and there by force of the gunpowder aforesaid, by the said Oliver P. Jewell discharged and shot off as aforesaid, then and there feloniously, wilfully, premeditatedly and of his malice aforethought, did strike, penetrate and wound him, the said James McGuinn, in and upon the right side of the face of him, the said James McGuinn, giving to him, the said James McGuinn, then and there, with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid, by the said Oliver P. Jewell, in and upon the right side of the face of him, the said James McGuinn, one mortal wound of the depth of six inches, and of the breadth of half an inch, of which said mortal wound, he, the said James McGuinn, then and there, instantly died.

"And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Oliver P. Jewell, him the said James McGuinn, in the manner and by the means aforesaid, feloniously, wilfully, premeditatedly and of his malice aforethought did kill and murder; contrary to the statute in such case made and provided, and against the peace and dignity of the people of the Territory of Oklahoma.

"Second count. And the grand jurors, selected, examined, empanneled and sworn as aforesaid, on their oaths as aforesaid, do further find and present: That one Oliver P. Jewell, late of the county of Woodward, and the Territory of Oklahoma, on the twenty-ninth day of October, A. D. 1894, then and there being, with force and arms at and in the county aforesaid, in and upon the body of one James McGuinn, in the peace of said Territory, then and there being, feloniously, wilfully, with

premeditation, and malice aforethought did make an assault, and that the said Oliver P. Jewell, a certain pistol then and there charged with gunpowder and two leaden bullets, which said pistol, he, the said Oliver P. Jewell, in his right hand then and there, had and held then and there feloniously, wilfully, with premeditation, and of his malice aforethought, did discharge and shoot off to, against and upon the said James McGuinn, and that the said Oliver P. Jewell, with one of the leaden bullets aforesaid, out of the pistol aforesaid, then and there, by the force of the gunpowder aforesaid, by the said Oliver P. Jewell discharged and. shot off as aforesaid, then and there feloniously, wilfully, with premeditation, and of his malice aforethought, did strike, penetrate and wound him, the said James McGuinn, in and upon the back of him, the said James McGuinn, giving to him, the said James McGuinn, then and there, with the leaden bullet aforesaid, so as aforesaid discharged and shot out of the pistol aforesaid, by the said Oliver P. Jewell, in and upon the back of him, the said James McGuinn, one mortal wound, of the depth of six inches, and of the breadth of half an inch, of which said mortal wound, he, the said James McGuinn, then and there, instantly died.

"And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Oliver P. Jewell, him, the said James McGuinn, in the manner, and by the means aforesaid, feloniously, wilfully with premeditation, and of his malice aforethought, did kill and murder; contrary to the statute in such case made and provided, and against the peace and dignity of the Territory of Oklahoma, and the people thereof.

"Third count. And the grand jurors, selected, examined, empanneled and sworn as aforesaid, on their oaths as aforesaid, do further find and present, that one, Oliver P. Jewell, late of the county of Woodward, and the Territory of Oklahoma, on the twenty-ninth day of October, A. D. 1894, then and there being, with force and arms in the county and Territory aforesaid, in and upon one,

James McGuinn, then and there being in the peace of the Territory, feloniously, wilfully, premeditatedly and of his malice aforethought, and from a deliberate and premeditated design to effect the death of said James McGuinn, did make an assault, and that the said Oliver P. Jewell, a certain pistol then and there charged and loaded with gunpowder and leaden bullets, which he, the said Oliver P. Jewell, then and there in his right hand had and held, at and against the said James McGuinn, then and there feloniously, wilfully, and of his malice aforethought, and from a deliberate and premeditated design to effect the death of the said James McGuinn, did shoot off and discharge, and that the said Oliver P. Jewell, with the leaden bullets aforesaid, by means of shooting off and discharging the said pistol so loaded and charged, at and against the said James McGuinn, did then and there feloniously, wilfully, and of his malice aforethought, and from a deliberate and premeditated design to effect the death of the said James McGuinn, strike, penetrate and wound the said James McGuinn, in and upon the right side of the face, and in and upon the back of him, the said James McGuinn, giving to him, the said James McGuinn, then and there, with the leaden bullets aforesaid, by means of shooting off and discharging the said pistol, so loaded, at and against the said James McGuinn, and by such striking, penetrating and wounding the said James McGuinn as aforesaid, two mortal wounds, one in the face and through the head of him, the said James McGuinn, and one in and upon the back and through the body of him, the said James McGuinn, of which said mortal wounds the said James McGuinn did then and there instantly die.

"And so the grand jurors aforesaid, upon their oaths aforesaid, do say that the said Oliver P. Jewell, him, the said James McGuinn, in the manner and by the means aforesaid, feloniously, wilfully, of his malice aforethought, and from a deliberate and premeditated design to effect the death of the said James McGuinn, did kill and murder; contrary to the form of the statute in such case made

and provided, and against the peace and dignity of the people of the Territory of Oklahoma.

"B. B. Smith,
" County Attorney Woodward county, O. T."

The cause was tried upon all three counts without an election and the jury returned the following verdict:

" In the District Court within and for Woodward county,. Oklahoma.

"The Territory of Oklahoma v. Oliver P. Jewell, Defendant.

" verdict.

"We, the jury empanneled and sworn in the above entitled cause, upon our oaths, find the defendant, Oliver P. Jewell, guilty of murder as charged in the first count in the indictment, and not guilty as to the second and third counts thereof; and we determine that he shall be punished by death.

" Asa L. Henson, Foreman."

Judgment was rendered against the appellant upon this verdict and this limits our examination of this phase of the case to the first count.

The contention of appellant is that the allegations of the first count of the indictment will not support a judgment for murder.

This presents a grave and difficult question, involving as it does the construction of our statutes and the interpretation of common law terms and phrases. The count contains a good common law charge of murder, and unless our statutes defining the various degrees of homicide have changed the common law rule, then it is sufficient to support the verdict and judgment in this case. The trial courts have experienced no little difficu.ty in the trial of this class of cases in an attempt to properly define the degrees of homicide according to our statutes, and to apply the rules laid down in the text books

and adjudicated cases to crimes charged under our statute on the subject of homicide. We apprehend that this difficulty has arisen out of the attempt to apply common law rules to our statutory definitions upon the theory that no substantial difference exists. A careful analysis of the statute will make clear a manifest distinction. Murder is defined in our statute as follows, § 2078″, Oklahoma Statutes:

"Homicide is murder in the following cases:

"First. When perpetrated without authority of law, and with a premeditated design to effect the death of the person killed, or of any other human being.

"Second. When perpetrated by any act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.

"Third. When perpetrated without any design to effect death by a person engaged in the commission of any felony.

"Sec. 2086. Homicide is manslaughter in the first degree in the following cases:

"First. When perpetrated without a design to effect death by a person while engaged in the commission of a misdemeanor.

"Second. When perpetrated without a design to effect death, and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide.

"Third. When perpetrated unnecessarily either while resisting an attempt by the person killed to commit a crime, or after such attempt shall have failed.

"Sec. 2090. Every killing of one human being by the act, procurement or culpable negligence of another,

which, under the provisions of this chapter, is not mur-. der, nor manslaughter in the first degree; nor excusable, nor justifiable homicide, is manslaughter in the second degree."

These statutes are intended to classify all grades of homicide, and to furnish a specific definition for each class.

Under subdivision one of § 2078, the homicidal act must be done with a premeditated design to effect the death of the person killed, or some other person. The premeditated design to effect death is the material element of the offense and must exist at the time the homicidal act is committed or there is no murder. It is not sufficient that the fatal shot was fired premeditatedly, for this only implies that the act is done in pursuance of a prior determination. This may be true, and yet the shot have been fired for the purpose of maiming or disabling the injured party; nor is it sufficient to allege that the homicidal act was done with malice aforethought. In its legal sense "malice" expresses the idea of a willingness to injure another, and when qualified by the word "aforethought" it implies that the act was done on a previous determination. And one may shoot at another with malice aforethought, intending only to break his pistol arm, or disable him, yet, with no design to effect the death of the person he desires to injure.

Murder, at common law, was committed when a person of sound mind and discretion unlawfully killed any reasonable creature in being in the peace of the sovereign with malice aforethought, either express or implied. According to this rule if one feloniously and with malice aforethought wounded another, from which wound death ensued within a year and a day, it was murder, unless excuse or justification was shown. Under

our statute such act would not constitute an element of murder unless perpetrated with a premeditated design to effect the death of the person killed or of some other person, but would be embraced within some one of the lower degrees of homicide.

In Iowa the statute makes murder in the first degree a wilful, deliberate and premeditated killing. In *State v. Boyle*, 28 Iowa, 522, an indictment in the common law form was held insufficient to charge murder in the first degree because it omitted the word "deliberate," and it was held that neither of the common law terms were equivalent to this word, and a conviction for murder was set aside.

In the case of *State v. McCormick*, 27 Iowa, 402, it was held, Mr. Chief Justice Dillon speaking for the court, that a common law count in an indictment would not support a conviction for murder in the first degree, and in that case it was said:

"There is no principle in the law of criminal pleading more reasonable in itself, and none better understood than the one that the indictment must fully charge the crime; that it must set out all that the law requires to be proved before the penalty of the law can be inflicted, and consequently everything which changes the nature or increases the degree of the punishment is substantive, and ought to be alleged."

In the case just quoted from, it was contended that inasmuch as the proof was sufficient to establish the deliberation and premeditated design to kill, that the judgment ought to be sustained. Mr. Justice Dillon on this point says:

"On principle, how can want of averment be supplied by an independent inquiry by the jury and a finding by them of a fact not alleged on the record against the pris-

oner, viz., that he intended to take the life of the deceased, a fact necessarily included in every finding in cases like the present that he is guilty of murder in the first degree?"

And this rule is undoubtedly sound. It would be an anomaly in criminal procedure that would permit a court to supplement the charge in the indictment with facts found by the jury and not alleged in the indictment; and, putting the two together, determine that the crime is murder as defined in the statute. It will be observed that there is no allegation in the first count of the indictment in this case on which the appellant was convicted, that the assault was committed with the premeditated design to effect the death of the deceased, nor does it contain equivalent language. In fact it is no where alleged that the shooting complained of was with any intent to effect death, except in so far as the same may be inferred from the words "wilfully, premeditatedly and with malice aforethought," and as we have before stated, these elements might all be present in an aggravated assault and yet be no premeditated design to effect death. The first count is therefore insufficient to support the judgment of murder, unless the charge is good under the second subdivision of § 2078, which provides that "homicide is murder when perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual."

It is contended by the attorney general that the indictment is good under this definition of murder, and that the case under consideration comes within this class. We are unable to adopt this view.

The class of cases intended to be covered by this sub-division is where the acts by which the homicide is perpetrated are directed against no particular person, but against a number of persons generally, or where the act is imminently dangerous to a number of persons, but directed against none. As where one rides a vicious horse into a crowd of persons with no intent to injure any person, but with a reckless disregard of human life; or, where one throws a heavy stone into a crowded street, or blows up a building with dynamite, knowing there are persons in the building, but with no design to kill any one, but only with an intent to destroy the building. There are other cases that come within this class, but we use these as illustrations. And the statute has no application to a case where the act causing death is directed against some particular person, for then, if it is done with design to effect death, it comes within the class embraced in the first subdivision; or, if there is no premeditated design to effect death, then, it is either one of the degrees of manslaughter, or justifiable, or excusable homicide.

The statute of Florida, defining homicide, is the same as ours, except that the class embraced in the second subdivision is made murder in the second degree, while we have no such grade of homicide.

In the case of *Johnson v. State*, 4 Southern Rep. 535, the supreme court of Florida, speaking by Chief Justice Maxwell, on this subject, said:

"The statute of this state in regard to homicide makes seven degrees of the offense—three of murder and four of manslaughter. It is unnecessary to recite these in detail here, but it is not to be forgotten that every degree has its own distinguishing features and that facts

which bring a case within either must be met by a verdict of guilt in that special degree. The offense each degree marks out is a separate offense from that marked out by either of the other six, to be determined, as the statute prescribes, 'according to the facts and circumstances of each case.' In the present case the offense the jury found is defined in the statute thus: The killing of a human being, 'when perpetrated by any act immediately dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual, shall be murder in the second degree.' To understand what this means, let us consider it in connection with the other degrees of murder as defined in the statute. The killing of a human being, 'when perpetrated from a premeditated design to effect the death of the person killed, or any human being, shall be murder in the first degree.' 'When perpetrated without any design to effect death, by a person engaged in the commission of any felony, it shall be murder in the third degree.' The first evidently requires that the killing should be in pursuance of a premeditated design to effect the death of some human being, though the person killed was not the one intended. Comparing this with the second, one chief difference is that the element of premeditation is essential in the former, but not in the latter, though, if it exists in the latter, it is not to be directed against any particular individual. Another difference is that the design in the first need not be directed against the person actually killed, but, nevertheless, must be against some particular individual; while in the second it is not only not necessary that the design should be aimed at any particular individual, but if the design be to kill, it must come from a general deadly intent; and it must be executed by an act imminently dangerous to others, evincing a depraved mind, regardless of human life. But in the second it is not required, in all cases, that there should be an intent to kill. For instance, if a man, out of enmity to the owner of a vessel, and desiring to do him injury, should use dynamite or other explosive to destroy the

5——IV.

vessel while he knew passengers were aboard, and death should ensue to one or more of them, that would be a case of murder in this degree. Every element of the degree, the imminently dangerous act, and the depraved mind, regardless of human life, would be present, although the intent was to destroy property, not life."

The Florida court has well stated the rule applicable in the case at bar, and the same result must follow. There is nothing in the charge to indicate that the case was one coming within the class embraced in the second subdivision, defining murder; nor is there anything in the proof to support a verdict under such a charge. It was evidently an afterthought of the attorney general to try to save his case by bringing it within this class. The first count of the indictment upon which appellant was convicted, contains a good charge of manslaughter, and the demurrer was properly overruled, for, as we have said, it contains a good common law charge of murder, and every charge of murder necessarily embraces the lower grades of homicide in some of its forms. But we hold that the charge was not sufficient to charge murder under subdivision 1 of § 2078, for the reason that the element of premeditated design to effect the death of the deceased or some other person was omitted, and that the charge will not support a conviction for murder under said subdivision. We further hold that the proof will not sustain a conviction under subdivision 2, for the reason that it does not appear that the act causing the death of the deceased was one imminently dangerous to any other person, or that the act was done regardless of human life generally.

The state of New York at an early day adopted a statute on homicide, of which ours is almost a verbatim copy. There is some confusion in the earlier cases as to

the proper interpretation of the statute, but in 1854 the court of appeals of that state for the first time had the question before it, and adopted the interpretation which has since been followed in that state.   The case is reported in 10 N. Y. 120, *Darry v. People*, and the opinion of the court is a lengthy and critical analysis of the common law terms and the changes made by statute, and as it expresses our views on the subject, we quote it at some length, and adopt it so far as it applies to the question before us.   Mr. Justice Selden, speaking for the court, said :

"In putting a construction, therefore, upon our statute, we should lay aside entirely the common law terms of express and implied malice, as calculated to mislead and to engender false ideas, and interpret the phraseology, as before insisted, according to its ordinary import.

"Looking, then, at the statute itself, and construing it in this spirit, what is its real scope and meaning?   In endeavoring to answer this inquiry, it is important to keep in view certain rules, which reason and experience have established, as calculated to aid in the just interpretation of statutes.

"If the enactment be subdivided, each subdivision should be construed so as to provide for a separate and distinct class of cases, and so as to include all the cases it is intended to embrace, and to exclude all others.  Each clause is also to be construed in the light of all the rest, and so as to give force and effect to every sentence and word; and such a construction is to be put upon the whole, if possible, that no case or class of cases will fall within more than one branch of the act.   These rules are necessary in order to attain that precision and certainty which is the object of the subdivision.

"There is, I believe, no great contrariety of opinion as to the meaning of the first subdivision of § 5, of the statute in question.   If there is any difficulty in this respect, it is in ascertaining whether the last clause of

that subdivision, viz., 'or of human being,' was intended to provide solely for cases, where the premeditated design, although not aimed at the person actually killed, was nevertheless directed to some particular individual; or whether it also includes cases where it was aimed indiscriminately at a multitude of persons, or at human life in general. That the former is the true interpretation, was insisted by the prisoner's counsel, upon the argument, for several reasons. He urged, first, that on comparison of § 5, of our statute with the description of murder from malice aforethought express, as given in East's P. C. 223, § 10, and considering that the revisors in their note to § 5; expressly say, that it was compiled partly from East, it is apparent, that the first two subdivisions of § 5 were copied substantially from the definition given by East; the only material difference being, that the first two subdivisions of East are, in our statute, condensed into one, and that as both subdivisions in East are plainly and expressly confined to cases of malice to a particular individual, the corresponding subdivision in our statute should receive the same construction. Again, he contended, that, as the first clause of this subdivision was clearly confined to cases of particular malice, the last, being directly connected with it, should be held to belong to the same class, agreeable to the maxim *noscitur a sociis.* (Broom's Leg. Max. 294; *Evans v. Stevens,* 4 T. R. 225.) I have very little hesitation in adopting the construction of this subdivision thus contended for, not only for the reasons given by the counsel, but for others which will appear when we take into consideration the second subdivision.

"This brings us to the difficult part of our task—that of interpreting the second subdivision of the section in question. This subdivision was incidentally and partially considered in *People v. White* (24 Wend. 520,) and in *People v. Rector* (19 Wend. 569,) but the examination given to it in those cases was cursory merely, and no attempt was made to subject it to that rigid analysis which is indispensible to the development of its true meaning. It becomes necessary, therefore, in my view,

to look at the subject as an original question.   In doing so, I shall inquire, first, whether an actual intent to destroy life is, in all cases, essential to constitute the crime of murder, under this subdivision.

"The affirmative of this question was very strenuously contended for by the counsel for the prisoner, upon the argument, and great learning and ability were displayed in the effort to maintain it.   He contended that there was a substantial identity of design and object between our statute and that of Pennsylvania, passed in 1794; and that, as the later statute had been construed to limit murder, as a capital crime, except in a few specified cases of constructive murder, to those cases in which an actual intent to take life exists, ours should receive the same construction; and insisted, that the first subdivision of § 5 being intended to provide for all cases where the hostile intent was specially aimed at the life of some one individual, the second subdivision was designed to embrace only those cases excluded from the first, where the intent, although deadly, does not single out its object.

"But there are serious objections to taking this view of the later subdivision, conceding the construction thus put upon the first to be, as I think it is, correct.   Of what use, upon this supposition, are the words 'imminently dangerous to others'?   Are they not rendered mere unmeaning verbiage, by assuming that an actual intent to take life is essential to the crime under this subdivision?   Again, if such an intent is necessary, the requirement must be found in the definition of the crime given by the statute.   The only affirmative words indicative of the intent required are these—'a depraved mind, regardless of human life.'   These words describe the state of mind which must accompany the act; do they express a formed intent to destroy life?   Clearly not; no sound reason can be given, why the legislature should have resorted to such equivocal and circuitous phraseology, to express that simple intent.   Such an intent is expressed in clear terms, in the subdivision which precedes, as well as that which follows, the one under review; would they

not have expressed the same intent in the same way in this, if that was what was meant? Would they have resorted to phraseology, not only peculiar but such as does not import what, upon this supposition, they intended? It seems to me, not.

"But this is not all: The phraseology of the subdivision is taken substantially from the writers upon the common law. An absolute intent to take life was not necessary, at common law, to constitute the crime described by this phraseology; as to this there is no room for doubt. The first general division of homicide, as given by East, is as follows: 'From malice aforethought, express; where the deliberate purpose of the perpetrator was to deprive another of life, or to do him some great bodily harm.' (1 East's P. C. 222, 9.) This general division of homicide is again divided by East into three subdivisions, in the next section, as follows: (1). From a particular malice to the person killed. (2). From a particular malice to one, which falls by mistake or accident on another. (3). From a general malice or depraved inclination to mischief, fall where it may. Now as this third subdivision is obviously a specification of the nature of the cases falling within the last clause of the previous general division, it is entirely clear, that it was intended to describe a class of cases in which a deadly intent is not required to make out the crime.

"It has been already intimated, that the first subdivision of § 5 of our statute appears to be a virtual transcript of the first two subdivisions just given from East. It is, I think, equally apparent, that the second subdivision in our statute was taken substantially from the third subdivision of East, although not a literal transcript of it. The inference from this is very strong, that it was intended to describe the same class of cases; and if so, then it follows, from what has already been said, that a deadly intent is not necessary to constitute the crime of murder under it.

" But there is an important clause added to the second subdivision in our statute, which does not appear at all

in East; and it becomes indispensable to ascertain its design and object. If we can discover the true object of introducing this clause, we have a key to the interpretation of the whole section. The words are, 'although without any premeditated design to effect the death of any particular individual.' These words must have been introduced for some purpose; what was it?

"I remark, first, that they were not designed to show that a particular deadly intent is not essential to constitute the crime, because they could not have been deemed at all necessary for that purpose. The idea of such a necessity seems, as we have already shown, to be excluded by the whole phraseology of the subdivision. No corresponding language is contained in East's definition of this class of murders; he evidently considered the definition complete and perfect without it. Besides, if this clause was introduced for that purpose, the plain implication would be, that a general deadly intent, not aimed at any particular individual, is necessary. This would be repugnant to all our previous reasoning, and would exclude from the operation of the subdivision the very cases which, at common law, marked the class. This view of the clause would also effectually exclude the case at bar from the subdivision. But I consider it clear, from what has been heretofore said, that this could not have been the object of the clause.

"There is but one other purpose which this clause could have been intended to subserve. Although the terms of the second subdivision do not require a deadly intent, to make out the crime, yet, independent of the clause in question, they do not exclude it. Hence, the second subdivision might be construed to embrace most, if not all, the cases provided for in the first. This would defeat the very object of the classification, which was, to draw a clear line of distinction between the different classes, and prevent confusion by their merger.

"The plain object, therefore, of the last clause of the second subdivision, and the only conceivable object, I hold to have been, to mark the distinction between that

subdivision and the first, by at once excluding from the former all cases of particular, and at the same time stating that it was not intended to exclude cases of general deadly intent. Assuming this to have been its object, it is apparent, that force and significancy is given to every word of the clause in question; and that each of these subdivisions is made to stand out, isolated and distinct, with boundaries clearly marked, and with no tendency to confusion with each other.

"It will be seen, that this view necessarily limits the first subdivision to cases of particular malice, from the antithetical relation between that subdivision and the last clause of the second. This will be made more apparent, by reading the two clauses in connection, omitting the intermediate significant words, thus: 'When perpetrated from a premeditated design to effect the death of the person killed, or of any human being; or when perpetrated' (in a certain way), 'although without any premeditated design to effect the death of any particular individual.' I doubt whether any other reading can be adopted, which will at once give scope and meaning to every word of both subdivisions, and at the same time, accomplish the object of drawing a definite and clear line of demarcation between the two. We have, then, the precise classification of East; the only difference being, that in our statute, it is simplified, by reducing the first two subdivisions into one, and rendered a little more definite by the express exclusion from the last subdivision of all cases embraced in the first.

"What, then, are the cases which, upon this construction, were intended to be included in the second subdivision? In considering this question, it is clearly proper, in the first place, to inquire what kind of cases were embraced in the corresponding class, as defined by East. The words in East are: 'From a general malice, or depraved inclination to mischief, fall where it may.' The word 'general,' here used, and the last words of the sentence, leaves no doubt as to the nature of the cases contemplated by this subdivision; they were cases of de-

praved and reckless conduct, aimed at no one in particular, but endangering indiscriminately the lives of many, and resulting in the death of one or more.

"If this be not clear upon the words themselves, the comments of Mr. East upon this subdivision would seem to put the matter at rest. (1 East's P. C. 231, 18.) In illustrating this subdivision, he says: 'The act must be unlawful, attended with probable serious danger, and must be done with a mischievous intent to hurt people, in order to make the killing amount to murder in these cases;' and the instances he gives are as follows: 'If a person breaking in an unruly horse, wilfully ride among a crowd of persons, the probable danger being great and apparent, and death ensue from the viciousness of the animal, it is murder.' Again, 'so, if a man, knowing that people are passing along the street, throw a stone likely to create danger, or shoot over the house or wall, with intent to do hurt to people, and one is thereby slain, it is murder.' These are the only examples given, and they accord perfectly with the language of the subdivision, and show that the later was intended to embrace those cases of general malice only, where the lives of many were or might be in jeopardy. The inference is very strong, that the subdivision of our statute which we are considering, was intended to provide for the same cases as that of East, from which it was substantially taken. But the argument in favor of this construction is by no means confined to this inference.

"It is clear, I think, from what has been already said, that the subdivision in question does embrace those cases where an intent to take life exists, which is not directed to any particular individual, but is general and indiscriminate. The language of the subdivision, however, at the same time, shows that it was not intended to be confined to those cases, but was designed to include another class, closely akin to and almost identical with those; in which death is produced by acts putting the lives of many in jeopardy, under circumstances evincing great depravity and utter recklessness in regard to human

life.   For instance, a man may fire into a crowd, with the view of destroying life and he may do so for the mere purpose of producing alarm, although at the imminent hazard, as he knows, of killing some one.   Again, he may open the draw-bridge of a railroad, with intent to destroy the lives of the passengers, or he may do it for the sole purpose of effecting the destruction of the property of the railroad company.   The subdivision in question was intended to provide for all these and similar cases indiscriminately, putting them upon the same footing, without regard to the particular intent.   The phrases, 'imminently dangerous to others,' and 'depraved mind, regardless of human life,' have an apt and intelligible meaning, when used in regard to such cases.

" If, then, the subdivision was intended to include cases of this description, it would seem to follow, upon the plainest principles of construction, that cases of death produced by acts affecting a single individual only, are excluded.   It would seem repugnant to all sound rules of interpretation to associate under the same clause of a statute, groups of cases so dissimilar as those, examples of which I have just given, and ordinary homicides; especially where, as in the present instance, an attempt has been made, in framing the statutes, at a precise classification of the cases arising under it.

" The examples which I have given, as falling within the provision, belong to a class having marked features, easily distinguishable from all others; and there is no difficulty in so construing the subdivision in question as to exclude cases not belonging to this class, and, at the same time, so as to include all cases falling properly within it.   For these reasons, I am entirely satisfied that this subdivision was designed to provide for that class of cases, and no others, where the acts resulting in death are calculated to put the lives of many persons in jeopardy, without being aimed at anyone in particular, and are perpetrated with a full consciousness of the probable consequences.   Such acts may well be said to evince that reckless disregard of and indifference to

human life, which is fully equivalent to a direct design to destroy it. The moral sense of mankind distinguishes between acts of this sweeping and widely dangerous character, and ordinary cases of individual homicide, and so, in my judgment, does the statute.

" But there is an additional reason for putting this construction upon the subdivision in question. If it can be so construed as to include the case at bar, and others of a similar description, we are left wholly without any line of distinction between murder and manslaughter, except the loose and uncertain opinion of a jury, as to whether the act which produced death did or did not evince a 'depraved mind, regardless of human life.' There is scarcely a case of manslaughter which, upon this construction, may not be brought within the definition of murder, and punished as such, provided a jury can be found to say that the act which produced death evinced a 'depraved mind, regardless of human life,' because the other clause, to-wit, 'i ninently dangerous to others,' if it can apply to this, would apply to every case of homicide, as the result would always prove the imminently dangerous nature of the act; and because, upon this construction, cases of homicide, committed unintentionally, in the heat of passion, would not be excluded, as such a case might very well evince a depraved mind, regardless of human life, in the opinion of a jury. This construction then would throw us upon that sea of uncertainty, which it was the special object, of the revisors, in framing, and of the legislature, in adopting the section in question, to avoid

"My conclusion, therefore, is, that the only construction which is consistent with the language of the section as a whole, with the object aimed at in its adoption, with the precision and certainty of the law and with the convenient and safe administration of justice, is that which I have already given."

This construction, and we think it correct, disposes of the case at bar and is in harmomy with the Florida and Iowa courts where similar statutes exist.

There are a number of other errors alleged, but inasmuch as they may not arise again, we will not consider them at this time.

The judgment of the district court is reversed, a new trial ordered and cause remanded for further proceedings, and it is ordered that the court issue a mandate to the warden of the territorial prison directing 'him to deliver the prisoner to the sheriff of Woodward county, and transmit same to the sheriff of said county; and that said sheriff retain said prisoner in custody until discharged by due process of law, or the further order of the district court.

McAtee, J., who presided in the court below, not sitting; all the other Justices concurring.