Horace Darnell MASSIE, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–768.

Court of Criminal Appeals of Oklahoma.

Aug. 5, 1976.

Donald L. Worthington Fitzgerald, Houston & Worthington, Stillwater, for appellant.

Larry Derryberry, Atty. Gen., Michael Jackson, Asst. Atty. Gen., for appellee.

## OPINION

BLISS, Judge:

Appellant, Horace Darnell Massie, hereinafter referred to as defendant, was charged, tried and convicted in the Payne County District Court, Case No. CRF–74–322, for the offense of Murder in the Second Degree, in violation of 21 O.S.Supp. 1973, § 701.2. His punishment was fixed at a term of imprisonment of not less than ten (10) years nor more than life. From said judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness at trial was Jerry Carter, whose testimony disclosed that he was an emergency medical technician for the City of Stillwater, and that on the 20th of December, 1974, at approximately 8:23 A.M., he and his partner, Jim Beasley, responded to a sick call at 1017 South Knoblock in Stillwater. On arrival at the residence, they were directed to a bedroom where they found an unconscious black female child. Upon checking the child for vital signs and finding none, he initiated the standard emergency procedure of artificial resuscitation. When the child did not respond he and his partner carried her to the ambulance whereafter he and his partner and the defendant proceeded to the hospital. Upon arrival at the hospital the emergency room staff took over the treatment of the child and the elapsed time between receipt of the sick call by the emergency unit and arrival at the hospital was approximately five (5) minutes and fifty-four (54) seconds.

The next witness was Roger Bastion whose testimony revealed he was a detec-

tive for the Stillwater Police Department and was so employed on the 20th of December, 1974, when he was called to the Stillwater Municipal Hospital to investigate the beating of a child. Upon arrival at the hospital at approximately 9:00 A.M., he entered the emergency room where he observed and examined the body of a black female child. From an examination of the medical reports he learned the child was Angelina Terrill Massie, four (4) years old. At trial he identified black and white photographs of the victim which he had taken in the emergency room on that day. After the taking of the pictures at the hospital he requested two (2) police officers to locate the defendant in the hospital lobby and to transport him to the police station and to advise the defendant of his rights. After tending to some other business, he returned to the police station where he questioned the defendant in his office. Upon ascertaining that the defendant understood his rights he inquired into the circumstances surrounding the death of Angelina Massie whereafter the defendant related to him that Angelina had been acting strangely on the 19th of December; that she had no appetite and had been feeling faint. Defendant further related that on the morning of the 20th of December, Angelina had eaten breakfast and had then suffered dizzy spells. The defendant said he had tried to instruct the child on how to write her numbers and that when she refused he punished her by whipping her on the buttocks with his belt. Shortly thereafter the child passed out and when the defendant could not revive her he told his wife to call an ambulance. Officer Bastion further testified that the defendant did not cry while he was relating this version of the events surrounding the child's death.

On cross-examination Officer Bastion testified that the defendant's wife had told him at the hospital on the morning of the child's death that her husband had struck the child with objects other than his hand or a belt but acknowledged that his report filed shortly after the investigation contained the statement that Mrs. Massie had stated that she had never seen the defendant strike Angelina with any object except a belt.

Donald Ray Liles testified that he was a detective for the Stillwater Police Department and was so employed on the 20th of December, 1974, at which time he was called to the emergency room of the Stillwater Hospital to take color pictures of a victim of an alleged homicide. Officer Liles identified various pictures in court as those that he had taken of the body of Angelina Massie.

Dr. A. C. Redding testified that he was a practicing physician in Stillwater, worked with the State Medical Examiner's Office; that on the 20th of December, 1974, at approximately 8:45 A.M., he went to the emergency room of the Stillwater Municipal Hospital to investigate the death of a four (4) year old girl, Angelina Terrill Massie. He testified that the girl was dead at the time he arrived at the hospital and he examined the body and noted numerous bruises. He authorized the hospital staff to have the body transported to the Oklahoma Chief Medical Examiner in Oklahoma City for an autopsy.

Dr. A. J. Chapman testified that he was a licensed physician in the State of Oklahoma and a forensic pathologist; that he performed an autopsy on the body of Angelina Terrill Massie on the 20th of December, 1974. Testifying from his autopsy notes, Dr. Chapman stated that there were bruises and abrasions over much of the victim's body and his examination also revealed internal hemorrhaging. Dr. Chapman testified that in his opinion, based upon his autopsy findings, the cause of death was traumatic head injuries.

Louis B. Johnson testified that he was acquainted with Horace Massie; that on the 19th of December, 1974, while walking past the Massie home he heard a "rumpus" inside. Standing on the sidewalk in front of the house he could hear the sound of licks and a child moaning whereafter he

proceeded to the door to see if anything was wrong. The defendant answered the door with a strap in his hand and invited Johnson to come in. Johnson testified that he asked the defendant to explain why he had been beating the little girl and defendant responded that he was just spanking her. Johnson testified that he did not see the defendant's child because she was in the bedroom but that he spoke with the defendant's wife who was holding their other child. Shortly thereafter Johnson left. On cross-examination Johnson testified that he only heard the spanking and had not seen the defendant strike the child.

Ruby Brown testified that she lived on the other side of the duplex in which the Massies lived and that she had been their neighbor since the fall of 1974. On the 19th of December, at approximately 6:00 P.M. she noticed some bumping and thumping against the wall which she thought sounded like someone scuffling or fighting in the defendant's apartment. Later that night at approximately 9:30 P.M. she heard a scuffle in the defendant's bathroom and she heard the defendant swearing at the child. Mrs. Brown further testified that on the morning of the 20th of December, 1974, while she was getting ready to go to work, she heard the water running in the bathroom next door and she heard someone spanking the defendant's daughter and she heard the little girl crying.

Loretta Massie testified that she was the defendant's wife and that on the 19th of December, 1974, the defendant got up around noon that day and started trying to teach his daughter Angelina to write her numbers. When the daughter would not cooperate the defendant started whipping her with his belt. The daughter still refused to write her numbers and the defendant told her to undress so that he could spank her. After she had taken her clothes off the defendant started whipping her again with his belt but this session was interrupted when Louis Johnson knocked on the door and Mrs. Massie took Angeli-

na to the bedroom and spanked her to get her to redress. Mrs. Massie testified that after Mr. Johnson had left, the defendant gave Angelina another spanking and that she did not see him strike the child again until just before dinner when the defendant pushed the child again with his hand and knocked her down. At dinner the child wouldn't eat and was acting abnormally. Mrs. Massie further testified that on the morning of the 20th of December, 1974, she got up at approximately 5:00 A.M. and found her daughter in the bathroom vomiting and that she gave the child some water and put her to bed. Later that morning the defendant got Angelina out of bed and threw her on the floor and whipped her with his belt. After this beating the child went back to bed and appeared to be asleep but when Mrs. Massie noticed that she had no pulse she called the ambulance. Mrs. Massie denied that she had struck her child on the morning of the 20th of December and recalled that her husband had tied a belt around the child's ankle on the previous afternoon and that she had intervened so that he would not beat the child. On cross-examination Mrs. Massie admitted that she had pushed Angelina on the evening of the 19th of December, when she was slow in going to the bathroom to take a bath and on that occasion Angelina had fallen and hit her head on the edge of the stove. Mrs. Massie testified that when Louis Johnson had come to the door it was she and not her husband who was whipping Angelina for the purpose of making her redress. She also stated that Angelina had hit her head on the coffee table in the living room of the Massie's home on the 19th of December, when the defendant had pushed her. Thereafter the State rested.

The defendant took the stand to testify in his own behalf and his testimony revealed that he was twenty-five (25) years old and had been raised in Stillwater, graduating from High School in 1968. After High School he had enrolled in vocational classes at Okmulgee State Tech

which he attended briefly before enlisting in the Army in June of 1969. He was in the service for nearly four (4) years, serving in Viet Nam and Germany before sustaining electrical burns while in Germany and receiving a medical discharge. In March of 1973, he married his present wife who already had one (1) daughter. The daughter, Angelina, lived with her grandparents for two (2) months after the marriage and then came to live with her mother and the defendant. On the 19th of December, 1974, he spanked his daughter on two (2) different occasions while he was instructing her on her numbers. He also testified that her mother had spanked her once that day and had pushed her toward the bathroom that evening causing the child to hit her head on the stove in the kitchen. He recalled that on the morning of the 20th of December, 1974, he had awakened and gone into the kitchen to fix some food for his daughter and he noticed that she was acting strangely and had fallen down several times so he gave her a cold bath to try and revive her. When this did not work he instructed his wife to call an ambulance while he gave the child mouth-to-mouth resuscitation. On cross-examination the defendant testified that he had been a mortician in the army and served for five (5) months in Viet Nam. He admitted that although he had received electrical burns while in Germany, he had told his wife that the burns had been caused by napalm in Viet Nam. He stated that his daughter had been going to Head Start school in Stillwater, but he had kept her at home on the 19th of December, because she had been complaining about the food at the school. He confirmed that he had made his daughter take off her clothes on the 19th of December, so that he could spank her and that he had on one occasion pushed her against the wall of the duplex. The defendant then rested.

Upon a careful review of the record we are constrained to inquire into the proprie-

ty and validity of the jury verdict rendered in the instant case. The jury before which this defendant was tried returned a verdict of guilty of Murder in the Second Degree after finally having been submitted instructions upon all three (3) subdivisions of the second degree murder statute, the two (2) degrees of manslaughter and upon justifiable or excusable homicide.

Therefore, the starting point for this inquiry is the current provisions of the second degree murder statute. Title 21 O.S. Supp. 1973, § 701.2 provides:

"Murder in the second degree. Homicide is murder in the second degree in the following cases:

1. When perpetrated without authority of law, and with a premeditated design to effect the death of a person, or of any other human being, but by an act not enumerated in the preceding section;

2. When perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; or

3. When perpetrated without any design to effect death by a person engaged in the commission of any felony other than the felonious acts set out in Section 1 of this act.

■■■ Homicide is murder in the second degree, under the first subdivision of the statute, when the homicidal act is done with a "premeditated design to effect the death of the person killed, or some other person." See *Jewell v. Territory*, 4 Okl. 53, 43 P. 1075. From the aforegoing statement of facts we are of the opinion that insufficient evidence was presented at trial to establish the acts of the defendant were performed with a premeditated intent and design to effect the death of Angelina Massie.[1] Therefore, such facts preclude a

1. This conclusion is supported by the Special District Judge's order binding over the de-

fendant for trial upon the charge of second degree murder and not first degree murder as

jury's verdict of guilty based upon subdivision 1 of the second degree murder statute.

 "Homicide is murder, under the second division, 'when perpetrated by an act imminently dangerous to others, and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual.' And the homicidal act must be one imminently dangerous to more than the person killed. The classes of cases intended to be embraced in this subdivision are such as where the acts by which the homicide is committed are directed against no particular person, but against a number of persons generally, or where the act is imminently dangerous to a number of persons, but directed against none, and in either case without any premeditated design to effect the death of any particular person. Proof of the felonious killing of a particular person by an assault directed specifically at the person killed will not support a judgment for murder under said second subdivision." *Jewell v. Territory*, supra. See also *Gibson v. State*, Okl.Cr., 476 P.2d 362 (1971), and *State v. Mitchell*, 29 Wash.2d 468, 188 P.2d 88 (1947). Therefore, we find the proof in the instant case would not support the jury verdict of guilty based upon the second subdivision of the second degree murder statute. The principle long ago enunciated in *Jewell v. Ter-*

*ritory*, supra, limits and restricts the applicability of this particular subdivision to cases where the acts resulting in death are calculated to put the lives of many persons in jeopardy, without being aimed at anyone in particular, and are perpetrated with the full consciousness of the probable consequences. See *Jewell v. Territory*, supra. Therefore, factual circumstances at bar reflect the defendant's actions were directed against one particular individual, Angelina Massie, and therefore such actions do not constitute an offense governed by subdivision 2 of the second degree murder statute.

 Lastly we turn to subdivision 3 of the statute. Again in *Jewell v. Territory*, supra, construing the statutory language in subdivision 3, the Court stated: "Homicide is murder, under the third subdivision, 'when perpetrated without any design to effect death, by a person engaged in the commission of any felony'; and this means some felony as defined by statute other than that of the killing itself." Accordingly the predicate felony to sustain a subdivision 3 prosecution must be independent of the homicide itself. In the instant case the felony committed, child beating,[2] is not independent of the homicide and must merge into the homicide. Therefore, there is no independent felony which will sustain a subdivision 3 prosecution or verdict returned thereon.[3]

charged in the preliminary information. Such order implicitly finds the evidence presented at the preliminary hearing to be insufficient to prove a premeditated intent of the defendant to effect the death of the child killed. We do not have the benefit of a transcript of the preliminary hearing. Yet if evidence presented at trial was the same as that presented at the preliminary hearing, we would find the defendant's Motion to Quash should have been sustained. Notably, the trial information does not charge a "premeditated intent."

2. 21 O.S.1971, § 843, reads as follows:
"Beating or injuring of children—Penalty Any parent or other person who shall willfully or maliciously beat or injure, torture, maim, or use unreasonable force upon a child under the age of seventeen (17), or who shall

cause, procure or permit any of said acts to be done, shall be punished by imprisonment in the state penitentiary not exceeding ten (10) years, or by imprisonment in a county jail not exceeding one (1) year, or by a fine of not more than Five Hundred Dollars ($500.00), or both such fine and imprisonment."

3. Such a conclusion is reached notwithstanding the fact that the predicate felony in the instant case could not be utilized in light of the particular language of subdivision 3 and especially in light of the apparent holding in this Court's recent decision of *Campbell v. State*, Okl.Cr., 546 P.2d 276 (1976). The 843 violation in the instant case is one of the felonious acts set out in 21 O.S.Supp. 1973, § 701.1, and thus may not be the basis for a subdivision 3 prosecution.

Therefore, we conclude that the trial court should have sustained the Motion to Quash as the evidence would only support a prosecution and conviction of First Degree Manslaughter, or lesser included offense thereof, as the Magistrate effectively determined that insufficient evidence of a premeditated intent existed.

As noted in *Campbell v. State*, supra, a void in our homicide law currently exists with reference to an unpremeditated homicide occurring during a violation of 21 O. S.1971, § 843. Although First Degree Manslaughter is the highest degree of homicide sustainable for such violation, the perpetrator may suffer up to life imprisonment for this heinous offense.

Therefore, for the above and foregoing reasons, we find this case must be REVERSED AND REMANDED for a new trial in accordance with the views herein expressed.

BRETT, P. J., and BUSSEY, J., concur.