Richard CAMPBELL, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–75–180.

Court of Criminal Appeals of Oklahoma.

Feb. 5, 1976.

James D. Sill, Shawnee, for appellant.

Larry Derryberry, Atty. Gen., James L. Swartz, Asst. Atty. Gen., Kenneth Lisle, Legal Intern, for appellee.

## OPINION

BUSSEY, Judge:

Appellant, Richard Campbell, hereinafter referred to as defendant, was charged in Case No. CRF–74–258, in the District Court, Pottawatomie County, with the offense of Murder in the First Degree, After Former Conviction of a Felony, in violation of 21 O.S.Supp.1975, § 701.1. He waived a jury trial and was convicted by the judge of Murder in the Second Degree. He was given an indeterminate sentence of ten (10) years to Life imprisonment in the State penitentiary. From that judgment and sentence a timely appeal has been perfected to this Court.

The State's first witness was Arleene Campbell, wife of the defendant and stepmother of the decedent. She testified that she and her three children lived with the defendant, and that shortly after her marriage to defendant they obtained custody of his daughter, Julie (the decedent) in December of 1973, when she was approximately 13 months old. She testified that Julie was unable to walk at that time, but learned to do so within about a month.

After being granted immunity from prosecution, she testified that in April of 1974 Julie was taken to the hospital after

defendant discovered a "soft spot" on her head. Julie spent in excess of a week in Children's Hospital in Oklahoma City before being returned to the Campbells. She stated that she did not know how Julie was injured, and that the morning the injury was discovered Julie had been playing around the house with her toys. She testified that both she and the defendant had been alone with the child that morning. She further testified that in May of 1974 she took Julie to a Shawnee physician because the child seemed to be constipated, lethargic and in pain. She made several visits over the course of ten days to the doctor and the hospital in Shawnee. Finally, Julie was taken to an Oklahoma City hospital and subsequently died while hospitalized at Children's Hospital. Mrs. Campbell also testified that she and her husband had argued on a number of occasions because she thought he spanked Julie too hard. She testified that defendant spanked her for crying, for not going to sleep, and for temper tantrums. She testified that her own children had not mistreated the child, nor had she. She testified to a spanking administered by defendant on May 23, prior to treatment by the physician, and on June 1, 1974, during the period Julie was being treated by a doctor. Following that, the child's legs began to swell.

Mrs. Campbell also testified that about a week before Julie was hospitalized in April she fell to the floor of the family automobile when Mrs. Campbell stopped suddenly to avoid a collision. She was afraid the child was seriously injured, but she checked her over and she did not appear to be hurt. She also testified that subsequent to that incident, but prior to the April hospitalization, she dropped Julie a distance of about six inches in the bathtub.

The next witness was Philip E. Keen who testified he was a forensic pathologist, having been an Assistant State Medical Examiner in June, 1974, and that he had performed an autopsy on the body of Julie Campbell. The doctor testified that the autopsy revealed pressure abrasions along the back of the child; evidence of peritonitis within the abdomen; an abscess in the region of the spleen; evidence of a rupture of the bladder which had healed; evidence of pneumonia; and a fractured vertebra. He estimated that the fracture of the vertebra had occurred two weeks (plus or minus four or five days) prior to the time he examined her. In addition, there was evidence of brain damage, but the doctor was unable to make conclusive findings regarding that condition due to the fact that the decedent had been on a respirator for some time prior to death. He testified that he believed the cause of death to be from complications of blunt force, cranial and vertebral trauma.

On cross-examination, Dr. Keen testified that the rupture in the bladder could have been caused if the broken vertebra interrupted the nerve and blood supply to the bladder, causing it to fail to empty. The resulting distention of the bladder could cause a rupture, and the peritonitis, undoubtedly, was secondary to rupture of the bladder. He also testified that the rupture could have been caused by a blow to the abdomen.

The State then called each of defendant's three stepchildren. The oldest child, Ilene Goloversic, 15 years of age, testified that she had occasionally given the decedent a spanking for varying reasons, but that defendant had spanked the child harder. She testified that she never saw anyone mistreat the child, but that she did see defendant spank her. John Goloversic, 13 years of age, and Melanie Goloversic, 10 years of age, also testified that defendant spanked the decedent and that she was not mistreated by them or others.

The next witness for the State was Chris Eulberg who testified that he was an Oklahoma City Police Officer and that on the 5th of June, 1974, he responded to a call to go to Children's Hospital and arrest defendant and Mrs. Campbell on a charge of child beating. He testified that the Campbells were located in the parking

lot, leaving the hospital, and were arrested. He testified that he told defendant he was under arrest and that he should step from the car. As he told Mrs. Campbell she was under arrest, defendant said, "Don't take her. She didn't have anything to do with it. I did it myself." He stated that thereafter he placed both Mr. and Mrs. Campbell in the patrol car, advised them of their rights, and took them to the station. There was no further conversation.

The State then called Mrs. Alice Rodgers, Medical Records Librarian of Oklahoma Children's Memorial Hospital, who identified the hospital records of Julie Campbell for both the April and June admissions.

The next witness was J. Rodman Seely, M.D., a pediatrician. He testified to the April, 1974, treatment of Julie Campbell, stating that at that time she had bruising and swelling over the right side of the head and had bruises along her mid-back. He stated that the head injury had occurred within a matter of hours before his examination, but that the bruises along the back were incurred some time previous to that. He testified regarding his treatment of the child during hospitalization, particularly stating that laboratory tests showed no abnormality that would cause excessive bleeding, or cause her to bruise easily. He also testified that the head injury would require a significant, not minor degree of trauma.

The next witness for the State was Ruth Powers, a social worker with the Child Abuse Unit of the Oklahoma County Office of the Department of Institutions, Social and Rehabilitative Services. She testified that on April 22, 1974, she was notified of a suspected battered child at Children's Hospital and went there where she talked with Mr. and Mrs. Campbell. She testified and Mr. Campbell told her he had no idea how Julie's injury had occurred, and that he had discovered it the morning of the child's hospitalization. She testified that he was cooperative with her, although he expressed hostility toward the doctors

who had questioned him about her injuries. Mrs. Campbell also told her that she had no idea how the injury occurred. The witness testified that she met with the Campbells again in June when Julie was admitted first to St. Anthony Hospital and then to Children's Memorial Hospital, just prior to her death. She testified that at that time defendant was exasperated with her and that he told her he had initially taken Julie to St. Anthony rather than Children's because Children's had notified the Child Abuse Unit in April. After Julie was transferred to Children's, the witness went to speak again with defendant and his wife, but was unable to locate them and, on a subsequent visit, was advised that they had been arrested.

The next witness for the State was Kathleen V. Previll, M.D., a pediatric cardiologist, who was working as a resident at St. Anthony Hospital in June of 1974. She testified that she was involved in the treatment of Julie Campbell during the time she was at St. Anthony prior to being transferred to Children's. She testified to the child's critical condition and to her medical treatment. She testified on cross-examination that the child was transferred to Children's Hospital for more sophisticated treatment.

The State then called Teresa Stacy, M.D., a pediatric radiologist. She compared x-rays of Julie Campbell taken on April 19, 1974, with x-rays taken on June 5, 1974, and pointed out that while the spine appeared normal in the April x-rays a definite fracture could be seen in the June x-rays, showing that a vertebra had been pushed outwards. She also testified that the June x-rays showed a ruptured bladder (contrast dye was used to illustrate this in x-ray film). She also testified that the vertebral bodies of a child are very resilient and that it would require a tremendous force applied to the front of the body of the child to cause a fracture of this type.

The State then called James Wenzl, M.D., a pediatrician who also specializes in pediatrics-nephrology. He testified that

when Julie Campbell was transferred to his care from St. Anthony she was critically ill and in imminent danger of death. He testified that the catheter in place was removed and replaced with a larger one, but he further testified that the original catheter was not improper, and his subsequent actions were necessary because of her condition at that time. He testified that he believed the bladder resealed itself during the course of treatment but that her condition remained critical. Exploratory abdominal surgery was performed but no attempt was made to perform surgery on the fractured vertebra because of the child's condition and due to the fact that it was not likely that the condition could have been corrected by surgery. He also testified that it would require a great force to fracture the spine of a child.

On cross-examination, the witness testified that the fracture could have occurred anywhere from several hours earlier to no more than a week earlier. He stated further that in his opinion the child had sustained severe brain damage from shock or some other cause, and that this was the major factor in her death. He also testified, however, that he would not disagree with the cause of death as determined by Dr. Keen. When asked whether a diagnosis of the decedent's condition could or should, have been made on June 3, 1974, he stated that with certain symptoms present a thorough, not cursory, examination would have revealed the problems.

Thurman Wahpekecha, an uncle of defendant's wife, was then called by the State. He testified that on June 1, 1974, he was at the home of the decedent and saw defendant hit the decedent about four times around the waistline, applying a 20 to 25 pound pressure. He stated that in his experience as a father of six children, he believed the child was hit with sufficient force to cause injury. On cross-examination it was brought out that at one time the witness had stated he would lie if called to testify. The witness stated that at that time he had only been trying to

avoid involvement in the case, but that would not lie under oath.

The next witness was Letty Jo Brundage who testified she was a social service worker at Children's Memorial Hospital in April of 1974. She testified that she had a conversation with Richard Campbell, the defendant, and that he was very hostile to her, and that she notified the Child Abuse Unit to come interview him. She further testified that on June 5, 1974, when Julie was admitted a second time, she was waiting at the emergency entrance to meet the ambulance bringing Julie when she again encountered Mr. Campbell, who was again hostile to her.

The next witness called by the State was Walter Winsea, whose wife is a cousin of defendant's wife. He testified that on June 1, 1974, he was at the home of the defendant when he observed the defendant strike the decedent. He stated the blows did not fall on the child's posterior and seemed to be "wild spats." He further stated the blows were too hard for a small child, and were more the type one would administer to a 12-year-old child.

After this testimony, the State rested.

As its first witness, the defense called Josephine Brasiel, who testified that she was employed by the Department of Institutions, Social and Rehabilitative Services, and that in the fall of 1973 she made a home study at the request of Missouri Placing Out Division. At that time defendant was seeking the custody of Julie Campbell. Mrs. Brasiel testified that she did not recommend the home for placement because at that time Mr. Campbell and Mrs. Goloversic and her three children were living together, but Mr. Campbell and Mrs. Goloversic were not married at the time. She later conducted another home study and discovered that the couple had married and the home was approved. The Missouri authorities did not notify Oklahoma authorities of the placement, however, and according to Mrs. Brasiel's testimony her next contact with the Campbells

was after her unit was notified of Julie's April hospital admission. She testified that she made several home visits in late April and early May and that she could find nothing to prove that any certain person had abused the child.

The second witness for the defendant was Silas Edward Gaines who testified he lived next door to the Campbell family. He testified that he had seen Julie Campbell on two occasions: once being carried by Mrs. Campbell and once playing outside with the other children. He testified he had never seen either Mr. or Mrs. Campbell abuse the child. He also testified that since Mr. Campbell's incarceration the animals at the Campbell home had been mistreated and that he had seen John Golover-sic mistreating animals.

The next witness was Lloyd Ernst who testified he was manager of a TG&Y store and had been defendant's employer during the summer of 1973 and 1974. He testified that defendant was very concerned and affectionate toward his daughter the times he had seen them together. He also testified that he did not see defendant socially nor had he ever been in his home.

The next witness was Paul C. Gallaher, M.D., a general practioner in Shawnee. He testified that on June 3 he examined Julie Campbell and found that there was a little distention and gas in the abdomen and recommended that the child be given an enema. He testified there was no swelling in the legs and that the child's legs were working normally. Because Mrs. Campbell stated she did not know how to give the child an enema, he instructed her to take Julie to the Hospital and have it done there. Dr. Gallaher further testified that on June 4 he was at home ill when his nurse called and told him that Mrs. Campbell had returned with Julie and that the child was worse. He instructed them to go to the hospital and have the child checked there. He also testified that on May 25 and 29 he saw the child and, because Julie had fever and some swelling and seemed to be constipat-ed, he had instructed that the child be given milk of magnesia. On cross-examination he stated that he was certain the bladder was not injured on June 3.

The next witness was Rose Ann Graves who testified she was a licensed practical nurse at Mission Hill Hospital in Shawnee. She stated that on June 3, 1974, she administered an enema to Julie Campbell on the instructions of Dr. Gallaher. She testified that the child's abdomen, feet and legs were swollen, so much so that when Dr. Gallaher came by she called it to his attention. She testified that when she said, "Dr. Paul, would you look at the child's feet and legs?" he replied; "Yes, I know. I have saw it earlier." When she saw the child the next day the swelling was still present. In addition, the child was lethargic, had "grain" respirations, and a cyanotic color.

Finally, the defendant testified in his own behalf. He stated that he had sought custody of Julie Campbell, his daughter, when he discovered she as being placed for adoption. He testified that the child's mother, to whom he had been married, was in a mental institution in Missouri. He stated that his daughter appeared to be well cared for by her stepmother and that he loved Julie very much. He testified that during the time he was at work Mrs. Campbell was responsible for disciplining Julie, but he was responsible for her discipline when he was at home. He stated that he did not know the frequency with which he disciplined the child, but that he did so only when he thought she needed it. He testified he never saw any injury to her as a result of the discipline, and that he did not know how Julie sustained the head injury in April. His testimony was in accordance with the testimony of other witnesses as to the events at that time. Also, he testified that just prior to the June hospitalization, Mrs. Campbell came to him and told him that she had dropped Julie in the bathtub. A few days after that, he said, Mrs. Campbell noticed that Julie was swelling and took her to the doc-

tor. He testified that on June 1, 1974, he swatted Julie twice and put her in her chair, stating that she was standing on her feet when he swatted her.

The defendant testified that he made the statement to the police officer at the time of arrest because he was concerned about Julie and the other children and because he wanted to be sure his wife would be allowed to go home with them, and that she would not be put in jail. He thought if he made that statement the police would not take her or the children.

On cross-examination the defendant admitted he had two prior felony convictions in the State of California in 1962. He also testified that when Julie came to live with his family she could not stand. A picture of Julie taken prior to the time she was given over to defendant's custody was then introduced. In the photograph, the child is standing. He then stated she did not stand, but he didn't know if she couldn't or wouldn't. He further testified that the only argument he had with his wife about Julie was on June 1, when he spanked her and his wife asked him to leave the child alone because of her illness. He also admitted spanking the child on May 23, but stated it was not so hard a spanking as to injure her.

The defense then rested.

Defendant has raised three assignments of error on appeal. We will consider them in a slightly different order than presented by the briefs. For his second assignment of error, defendant alleges that the court erred in overruling his demurrer to the evidence for the reason that the corpus delicti was not established. His third assignment of error is related to the second, i. e., that the evidence was insufficient to support the verdict. These two assignments will be considered together.

■ Defendant has interpreted the evidence to show that medical negligence, not unlawful acts, were the cause of Julie Campbell's death. There was no expert testimony that medical negligence was the cause of death. The medical examiner testified that death was the result of complications of blunt force cranial and vertebral trauma. A number of witnesses testified to a spanking or whipping of unusual force administered by defendant only days before Julie Campbell's death. Only defendant offered evidence of an accident: a fall in the bathtub. Mrs. Campbell, however, testified that she dropped the child in the bathtub before the *April* hospitalization, not prior to the June hospitalization as defendant stated. We think that this evidence, taken together, is sufficient to show decedent's death was brought about by unlawful acts and, further, is sufficient to make out a case against defendant.

Defendant contends that the circumstantial nature of this evidence fails to exclude all other reasonable hypotheses for injury to the child. For other reasonable hypotheses, defendant suggests that the child might have been injured in the fall in the bathtub. As mentioned above, the evidence on this point is in conflict. Second, defendant suggests decedent might have been injured by an unexplained accident; however, there is nothing to show that the child was ever discovered crying or in a position to suggest accidental injury; and, in fact, the child was rarely left unattended and, even then, an adult was only a few feet away. The defendant also suggests that the child could have been injured by the stepmother or her children. However, no showing of mistreatment of any kind by these individuals was made. Instead, numerous witnesses testified to a pattern of severe spankings administered by defendant to the child, particularly at the time the injuries leading to her death occurred.

■ This Court has repeatedly held that where there is competent evidence in the record from which the trier of fact could reasonably conclude that the defendant was guilty as charged, this Court will not interfere with that determination upon the grounds that the evidence is insufficient. This holds true even when the evidence is

conflicting. See, *Pershica v. State*, Okl. Cr., 525 P.2d 1374 (1974); *Birdshead v. State*, Okl.Cr., 515 P.2d 1400 (1973); *Tilley v. State*, Okl.Cr., 511 P.2d 586 (1973); and *Jones v. State*, Okl.Cr., 468 P.2d 805 (1970).

The circumstantial nature of the evidence will not change this rule. We have also held that if circumstances are proven which support a reasonable and logical inference of guilt and which exclude any reasonable hypothesis except the guilt of. the accused, this Court will not disturb the verdict for insufficiency of evidence. See, *Stidham v. State*, Okl.Cr., 507 P.2d 1312 (1973); *Farrar v. State*, Okl.Cr., 505 P.2d 1355 (1973); *Hurley v. State*, Okl.Cr., 416 P.2d 967 (1966); and *Lamb v. State*, Okl. Cr., 375 P.2d 987 (1962). Accordingly, we find defendant's second and third assignments of error to be without merit.

Defendant's first assignment of error alleges that the court erred in returning a verdict for murder in the second degree as a lesser included charge. It is obvious from the record that the trial court wrestled with the problem currently existing in the Oklahoma murder statutes. As they now stand, there is no section covering unpremeditated murder committed in conjunction with the felonies listed in 21 O.S. Supp.1975, § 701.1 [1].

■ After clearly setting forth his findings that no premeditation existed on the part of defendant, but that fatal injuries were inflicted by him while he was in violation of Oklahoma's child beating statute, 21 O.S.Supp.1975, § 843, the trial court in-

[1]. Title 21 O.S.Supp.1975, § 701.1, reads as follows:

"Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

"1. When perpetrated against any peace officer, prosecuting attorney, corrections employee or fireman while engaged in the performance of his official duties;

"2. When perpetrated by one committing or attempting to commit rape, kidnapping for the purpose of extortion, arson in the first degree, armed robbery or when death occurs following the sexual molestation of a child under the age of sixteen (16) years;

"3. When perpetrated against any witness subpoenaed to testify at any preliminary hearing, trial or grand jury proceeding against the defendant who kills or procures the killing of the witness, or when perpetrated against any human being while intending to kill such witness;

"4. When perpetrated against the President or Vice President of the United States of America, any official in the line of succession to the Presidency of the United States of America, the Governor or Lieutenant Governor of this state, a judge of any appellate court or court of record of this state, or any person actively engaged in a campaign for the office of the Presidency or Vice Presidency of the United States of America;

"5. When perpetrated by any person engaged in the pirating of an aircraft, train, bus or other commercial vehicle for hire which regularly transports passengers;

"6. When perpetrated by a person who effects the death of a human being in exchange for money or any other thing of value, or by the person procuring the killing;

"7. Murder by a person under a sentence of life imprisonment in the penitentiary;

"8. When perpetrated against two or more persons arising out of the same transaction or occurrence or series of events closely related in time and location;

"9. *When perpetrated against a child while in violation of Section 843, Title 21 of the Oklahoma Statutes;* and

"10. Intentional murder by the unlawful and malicious use of a bomb or of any similar explosive." (Emphasis added)

Title 21 O.S.Supp.1975, § 701.2, reads as follows:

"Homicide is murder in the second degree in the following cases:

"1. When perpetrated without authority of law, and with a premeditated design to effect the death of a person, or of any other human being, but by an act not enumerated in the preceding section;

"2. When perpetrated by an act imminently dangerous to others and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual; or

"3. *When perpetrated without any design to effect death by a person engaged in the commission of any felony other than the felonious acts set out in Section 1 of this act.*" (Emphasis added)

terpreted the Legislature's meaning in 21 O.S.Supp.1975, § 701.1 and 21 O.S.Supp. 1975, § 701.2, when read together, that all unpremeditated felony murders would fall within the purview of murder in the second degree. While we can understand his desire to so construe these statutes and accordingly eliminate the void in our law, we are bound to construe criminal statutes strictly. *Matthews v. Powers*, Okl.Cr., 425 P.2d 479 (1967); and *Simpson v. State*, Okl.Cr., 267 P.2d 1008 (1954). If the Legislature desires to remedy the problem, it will do so.

 Accordingly, we modify the finding of the court to hold that defendant is guilty of unpremeditated homicide while committing a misdemeanor (assault and battery) and is, therefore, guilty of Manslaughter in the First Degree, in violation of 21 O.S., § 711. Thus, we modify his sentence from ten (10) years to Life imprisonment to that of ten (10) years' to fifty (50) years' imprisonment, and as so *modified* judgment and sentence is *affirmed*.

BRETT, P. J., and BLISS, J., concurs.