847 P.2d 1078

**The STATE of Arizona, Appellee,**

v.

**George Molina LOPEZ, Appellant.**

**No. CR–90–0142–AP.**

Supreme Court of Arizona,
En Banc.

Dec. 22, 1992.

Reconsideration Denied March 31, 1993.

Grant Woods, Atty. Gen. by Paul J. McMurdie, Chief Counsel, and Randall M. Howe, Phoenix, for appellee.

Harriette P. Levitt, Tucson, for appellant.

## OPINION

HATHAWAY, Court of Appeals Judge.

Defendant, George Molina Lopez, was convicted of one count of felony-murder and one count of child abuse. He was sentenced to death on the felony-murder conviction and 22 years' imprisonment on the child abuse conviction. We have jurisdiction pursuant to Article 6, § 5(3) of the Arizona Constitution, and A.R.S. §§ 13-4031 and 13-4033.

## FACTS AND PROCEDURAL HISTORY

Upon review, we must consider the facts in the light most favorable to sustaining the judgments and resolve all conflicts in the evidence and all reasonable inferences from it against the defendant. *State v. Zmich,* 160 Ariz. 108, 770 P.2d 776 (1989); *State v. Girdler,* 138 Ariz. 482, 675 P.2d 1301 (1983). Lopez met a woman in 1987 while he was coaching a coeducational softball team. He soon began having an affair with her and she became pregnant with his child in December 1987. Five months before the child was born, Lopez left his wife and moved in with the mother and her three-year-old son. The baby, named Anthony, was born in August 1988.

One year and nine days later, August 26, 1989, Anthony's mother left the apartment at 10:00 a.m. to go shopping. She took her older child with her and left Anthony in Lopez' care. When she returned around noon, Lopez told her an accident had happened. He explained that while he was disposing of a soiled diaper in another room, Anthony had gotten off the bed and pulled a nightstand over on himself. Anthony's mother saw that he had a bruise on his forehead and another under his chin. She wanted to take Anthony to the hospital, but Lopez refused, saying Anthony would be all right.

She held Anthony for a while and then laid him down. He soon wanted to be held again and she noticed that he was hot. She bathed him with alcohol and held him again. She again told Lopez that they should take the child to the hospital, but Lopez again refused.

Anthony's mother had to do some laundry, so Lopez carried the laundry to the laundry room. When he returned, she left Anthony with him and went to put the laundry in the washing machines. When she returned to the apartment, she found Lopez performing cardiopulmonary resuscitation (CPR) on Anthony. They then took Anthony to the emergency room at Univer-

sity Medical Center (UMC). Emergency room personnel unsuccessfully attempted to resuscitate Anthony; he was declared dead at 3:36 p.m.

The police were summoned to the hospital and Officer Mardula spoke with the emergency room physician, examined the injuries to Anthony's body and then asked Lopez if he would speak with her and he agreed. Lopez had tears in his eyes, but appeared calm and rational. Officer Mardula read Lopez his *Miranda* [1] rights and then asked him what had happened to Anthony. Lopez related the same facts that he had previously related to Anthony's mother. He stated that he examined the baby and determined he was "okay," but closely watched him. He stated that later when he was helping the mother with the laundry, he noticed that Anthony was not breathing. He performed CPR on the baby and then he and the mother took Anthony to the hospital. He became upset at this point, so Officer Mardula ended the interview.

Shortly after 5:00 that evening, Detectives Miller and Salgado approached Lopez at the hospital and asked him to accompany them to a room, adjacent to the emergency room, provided by the hospital for paramedics and police officers to do paper work. Lopez appeared calm. Detective Miller explained to Lopez that they wanted to tape record their interview and then asked him how Anthony was injured. Lopez stated that he and Anthony's mother were home, heard a crash in the bedroom and when they went to investigate, found Anthony lying face down under the tipped-over nightstand. However, later in the interview, Lopez changed his story. He admitted that the mother was not at home. He stated that he had left Anthony on the bed while he disposed of a diaper. When he returned, he saw Anthony with one foot in the middle drawer of the nightstand reaching for a piggybank. He yelled at Anthony, startling him. Anthony then jerked back and tipped the nightstand over on himself. He landed under the nightstand, face up.

Detective Salgado told Lopez he did not believe him and said the truth had to come out. Lopez denied any wrongdoing, and Detective Salgado said, "George, you're playing games with us now, George." Lopez finally admitted that he hit Anthony on the buttocks. Detective Salgado then read Lopez his *Miranda* rights. Lopez indicated that he understood his rights and would continue to answer questions. He never requested an attorney nor did he refuse to answer any of the detectives' questions, which he appeared to understand. The detectives concluded the interview and left the room at approximately 7:00 p.m.

While Lopez was being interviewed by Detectives Miller and Salgado, Detective Millstone, a member of the homicide detail, arrived at the hospital. Detective Millstone interviewed Lopez and pointedly asked him if he had ever struck Anthony in anger. Lopez denied striking the child. Detective Millstone thought that the tape recorder was affecting Lopez' candor, so he turned it off and asked Lopez what concerns he had about answering questions. Lopez told the detective he was afraid Anthony's mother might hear the tape. The detective told Lopez that he was not going to play the tape for her nor relate the details of the interview to her.

Detective Millstone then turned on the tape recorder and Lopez began to tell his version of how Anthony received his injuries. He stated: "I got angry, I got angry at everything, everything that has been boiling over. I've been very angry these past couple of days and [the mother] knows that and everybody knew it." Lopez stated that earlier that day, he had given Anthony a bath and laid him down to put lotion on him and "he peed, so I smacked him." Then Lopez stated: "And I smacked him hard and he started crying and I got angry, so I got the diaper and went and threw it away and that's when I saw him." At this time, Lopez recounted yet another version of the cause of Anthony's injuries. This time, after Anthony climbed on the nightstand and Lopez yelled at him, Anthony grabbed the lamp as he fell beneath the

1. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1965).

nightstand. Lopez jumped toward the nightstand to prevent it from falling on Anthony, but instead he fell on top of the nightstand. Then the radio, which had been on the nightstand, fell and hit Anthony in the face. Detective Millstone concluded the interview at 7:22 p.m.

Detective Millstone then spoke with the treating physician and the medical examiner who told him that the injuries Anthony suffered were not consistent with Lopez' stories. A telephonic search warrant was obtained for Lopez' apartment. Lopez went with the police officers to the apartment and demonstrated how Anthony was injured. After the demonstration, Lopez was arrested.

The next day, an autopsy was performed on Anthony. The doctor found numerous bruises on Anthony's face, chest, back and buttocks. Some bruises had occurred within 24 hours, but many were older. Anthony's skull was fractured in two places, one of which had been caused with such force that part of the fractured skull had been driven into the brain. Anthony also had an extensive hemorrhage in the membrane separating the brain from the skull.

The internal examination revealed that Anthony's 10th and 11th ribs were fractured near his spine. These injuries corresponded to the bruises on Anthony's back. These fractures had been caused within 24 hours of death. The doctor also found that Anthony's 7th, 8th and 10th ribs had been broken in the past and were healing when Anthony died. Anthony's pancreas was torn in two, his bowel and the membrane holding it in place were lacerated, and his spleen and adrenal gland had bled. The abdominal injuries had caused peritonitis. All of these injuries had been caused within 24 hours of death. The doctor determined that Anthony had died of blunt-force trauma to the head, chest and abdomen.

Lopez was indicted on one count of first-degree murder and one count of child abuse with an allegation that the child abuse count was a dangerous crime against children. The state filed a motion in limine to preclude Lopez from presenting evidence about his character for truthfulness, his general good character, the lack of prior instances of child abuse, and his non-violent nature. Lopez filed a motion to suppress all the evidence the state obtained pursuant to the search warrant and all the statements he made to the police officers. He also moved to suppress the use of his prior conviction for child molestation because a motion for a new trial was still pending, and, therefore, the conviction was not final. The trial court denied the motions to suppress and granted the motions to preclude character evidence and to preclude the use of the prior conviction. Over objection, the trial court admitted the autopsy photographs.

After the state rested, Lopez moved for a judgment of acquittal that the trial court denied. Lopez did not present any witnesses on his behalf but, out of the presence of the jury, made an offer of proof of the testimony his character witnesses would give if permitted to testify. The state then informed the trial court that it elected to argue a felony-murder theory to the jury and would forego arguing premeditated murder. The jury found Lopez guilty of intentional child abuse and murder in the first degree.

After an aggravation/mitigation hearing, the trial court found as aggravating circumstances on the child abuse conviction that Lopez (1) inflicted serious physical harm causing Anthony's death, and (2) committed child abuse in an especially heinous, cruel or depraved manner. The trial court found no mitigating circumstances and sentenced Lopez to an aggravated term of 22 years' imprisonment, to run consecutively to the sentence imposed for his prior child molestation conviction. The trial court also ordered Lopez to pay the hospital $1,995.75 as restitution for Anthony's medical care.

On the first-degree murder conviction, the trial court found that the state had proved two aggravating circumstances: (1) Lopez committed the murder in an especially heinous, cruel or depraved manner; and, (2) Lopez was an adult and the victim was under the age of 15 at the time of the

murder. The trial court found no mitigating circumstances and stated:

The victim, a child of 12 months and 9 days of age, was at the mercy of the defendant with no ability to protect or defend himself. His suffering was apparent or foreseeable, but defendant's selfish concern to shield himself from the consequences of his actions caused him to deny the child any hope for life or the surcease of his pain through medical treatment. The Court finds that the cruelty and depravity of defendant's acts toward the innocent, helpless baby in his care far outweigh any evidence which might call for leniency.

The trial court sentenced Lopez to death.

We consider the following issues on appeal:

1. Did the trial court commit reversible error in denying Lopez' motion to suppress his statements?

2. Did the trial court improperly admit gruesome photographs into evidence?

3. Did the trial court commit reversible error by precluding Lopez from presenting character witnesses in his defense?

4. Did the trial court improperly sentence Lopez to pay restitution?

5. Did the trial court improperly limit Lopez in his challenge of the search warrant?

6. Did the trial court improperly impose an aggravated sentence on the child abuse conviction?

7. Is A.R.S. § 13–1105(A)(2) unconstitutional in making child abuse a predicate offense for felony-murder?

8. Did the trial court commit reversible error in permitting the state to elect to proceed on the theory of felony-murder alone?

9. Did the trial court improperly impose the death sentence?

## STATEMENTS

Lopez argues that the trial court erred in denying his motion to suppress the statements he made to the police officers. He claims that the officers failed to properly advise him of his *Miranda* rights prior to each interview and that they coerced him into making the statements.

In Arizona, confessions are prima facie involuntary and the burden is on the state to show they are voluntary. *State v. Arnett*, 119 Ariz. 38, 579 P.2d 542 (1978). Such showing must be by a preponderance of the evidence. *State v. Knapp*, 114 Ariz. 531, 562 P.2d 704 (1977). A trial court's finding that a confession is voluntary will not be upset on appeal absent clear and manifest error. *State v. Jordan*, 114 Ariz. 452, 561 P.2d 1224 (1976), vacated on other grounds, 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157 (1978). We find no such error.

In determining the voluntariness of a confession, the trial court must look to the totality of the circumstances surrounding the confession and decide whether the will of the defendant has been overborne. *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); *State v. Knapp*, supra. The circumstances of this case support the trial court's finding that the confession was voluntary.

Officer Mardula, the first police officer to speak with Lopez at the hospital, advised him of his *Miranda* rights. During the second interview, when Lopez admitted having struck Anthony, Detective Salgado also read him his *Miranda* rights. Detective Millstone did not again advise Lopez of his *Miranda* rights when he subsequently interviewed him. However, we have held that an individual who has been advised of his *Miranda* rights does not have to be readvised of them prior to any subsequent questioning absent circumstances that would alert the police officers that the individual might not be fully aware of his rights. *State v. Noriega*, 142 Ariz. 474, 480, 690 P.2d 775, 781 (1984).

Nothing in Lopez' statements, actions or demeanor indicated that he was not fully aware of his rights during all of the interviews. When first advised of his rights, Lopez said he understood them and agreed to answer questions. Officer Mardula testified that he was rational, his answers

were responsive and appropriate to the questions asked, and he did not appear to be under the influence of drugs or alcohol. During all subsequent interviews, Lopez remained coherent and responded appropriately to the questions asked. The officers testified that he exhibited no change in behavior during the interviews that would indicate to them that he did not understand his rights at all times. The officers were not required to readvise Lopez of his rights before each interview. The statements were not obtained in violation of *Miranda,* and the trial court properly denied Lopez' motion to suppress.

Lopez also argues that his statements were coerced, claiming that he was offered a benefit if he would make a statement. Lopez points to only one allegedly coercive police tactic. Detective Millstone "promised" Lopez that he would not play the tape-recorded interview for Anthony's mother or tell her what Lopez told him during the interview. Lopez contends that without that inducement, he would never have stated that he became angry with Anthony and struck him.

■ Promises of benefits or leniency, whether direct or implied, even if only slight in value, are impermissibly coercive. *Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976); *Brady v. United States,* 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970).

■ *See also State v. Amaya–Ruiz,* 166 Ariz. 152, 800 P.2d 1260 (1990), cert. denied, —— U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991). Before a statement will be considered involuntary because of a "promise," evidence must be established that (1) a promise of a benefit or leniency was in fact made, and (2) the suspect relied on that promise in making the statement. *Amaya–Ruiz,* 166 Ariz. at 165, 800 P.2d at 1273; *State v. Hall,* 120 Ariz. 454, 457, 586 P.2d 1266, 1269 (1978). In this case, we do not find that any such promise was made.

■ Detective Millstone testified that he believed that the tape recording of the interview was interfering with Lopez' candor. He turned off the tape recorder and asked Lopez what concerns he had about the tape recorder. Lopez responded that he feared Anthony's mother might find out about the facts of the case. Detective Millstone explained to Lopez that he was not going to play the tape for her or discuss the details of the interview with her. Detective Millstone then turned on the tape recorder and resumed the interview. Detective Millstone made no promise to Lopez; he merely stated the fact that he was not going to play the tape for Anthony's mother or discuss the interview with her.

Assuming, arguendo, that Detective Millstone's statement could be construed as a promise, Lopez has not shown that the second prong of *Amaya–Ruiz* has been satisfied. Prior to Detective Millstone's interview, Lopez had told Detectives Miller and Salgado that he had struck the child. Accordingly, Lopez' admission occurred before the alleged inducement. We find no error in the trial court's determination that Lopez' statements were voluntarily made.

## PHOTOGRAPHS

Lopez next contends that the trial court improperly admitted photographs of Anthony, some of which showed the resuscitation equipment still attached. He argues that the admission of the photographs was inflammatory, misleading and prejudicial.

■ In determining the admissibility of photographs, the trial court must first decide whether they are relevant and whether they aid the jurors in understanding an issue in the case. *Amaya–Ruiz,* supra; *State v. Bailey,* 160 Ariz. 277, 772 P.2d 1130 (1989). If the photographs are relevant, the trial court must then decide whether they are inflammatory and if they are, whether the danger of unfair prejudice substantially outweighs the photographs' probative value. *Amaya–Ruiz,* 166 Ariz. at 170, 800 P.2d at 1278; Ariz.R.Evid. 403, 17A A.R.S.

■ Lopez was charged with felony-murder, the predicate felony being child abuse. The state was therefore required to prove that Lopez intentionally or knowingly caused a child under the age of 15

years to suffer physical injury. A.R.S. §§ 13–1105(A)(2), and (B), 13–3623(B)(1). The photographs were relevant to prove that Anthony had been abused.

We do not find the photographs to be inflammatory beyond whatever natural inflammation is attendant to autopsy photographs of a one-year-old child. One photograph shows Anthony's body attached to resuscitation equipment. The others show the bruising on Anthony's body. Such photographs cannot be deemed sufficiently gruesome to inflame the jurors because "the crime committed was so atrocious that photographs could add little to the repugnance felt by anyone who heard the testimony." *State v. Roscoe*, 145 Ariz. 212, 223, 700 P.2d 1312, 1323 (1984), cert. denied, 471 U.S. 1094, 105 S.Ct. 2169, 85 L.Ed.2d 525 (1985).

■ Lopez contends specifically that the photographs of the bruises were prejudicial because they were taken after lividity had begun discoloring the bruises, making them appear more severe than they were when Anthony was brought to the hospital. This allegedly prejudiced the jurors because the appearance of the bruises made it appear that Lopez must have known how severely he had injured the child. However, the doctor who performed the autopsy was cross-examined by Lopez' counsel about the effect of lividity on the bruises. The jurors, therefore, were aware that the discoloration occurred after Lopez took Anthony to the hospital.

Absent a clear abuse of discretion on the part of the trial court, we will not disturb its decision to admit photographs. *Amaya–Ruiz*, 166 Ariz. at 170, 800 P.2d at 1278. We find no abuse of discretion. The photographs were properly admitted.

## CHARACTER WITNESSES

Lopez next argues that the trial court erred in precluding him from having character witnesses testify as to his reputation for having a non-violent nature.

■ When presenting his case, the defendant may offer evidence of his good character as substantive evidence from which the jury may infer that he did not commit the crime charged. *State v. Kaiser*, 109 Ariz. 244, 508 P.2d 74 (1973); *M. UDALL, J. LIVERMORE, P. ESCHER and G. MCILVAIN, ARIZONA PRACTICE: LAW OF EVIDENCE* § 83 at 172 (3d ed. 1991). A defendant may offer evidence of good character in his defense as long as it pertains to a trait involved in the charge. *State v. Kaiser*, supra.

■ Lopez made an offer of proof that the proffered character witnesses would testify that they had observed him with children of various ages, that he was a peaceful, non-violent and calm individual, that he was a good counselor and sincere in dealing with children, and that he had a close relationship with Anthony. In sum, their testimony would be that Lopez was a non-violent individual who was caring when dealing with children, traits clearly relevant to the charge of physically abusing Anthony severely enough to cause his death. The trial court therefore erred in precluding the witnesses from testifying.

■ We find, however, that the error was harmless. One month prior to the trial, Lopez was convicted of one count of child molestation. When an accused places a character trait in issue as allowed by Ariz.R.Evid. 404(a)(1), 17A A.R.S., cross-examination is permitted into relevant, specific instances of similar conduct. Ariz.R.Evid. 405(a), 17A A.R.S. Here, the prosecutor would have been permitted to ask Lopez' witnesses whether they were aware of the fact that Lopez had been convicted of child molestation. Given this available impeachment evidence, the overwhelming evidence that Lopez was the only person who could have beaten Anthony and that the beating was the only cause of death, we believe the preclusion of the testimony of the character witnesses was harmless error. "Error is harmless or non-prejudicial when it can be said beyond a reasonable doubt that the error did not affect the verdict." *State v. Lundstrom*, 161 Ariz. 141, 150, 776 P.2d 1067, 1076 (1989). Such is the case here.

## PAYMENT OF RESTITUTION

The trial court ordered Lopez to pay restitution to UMC in the amount of $1,995.70, the amount of the hospital bill still unpaid at the time of sentencing. Lopez claims the trial court erred because the crime for which he was convicted, child abuse, does not have as an element economic loss to any person. He also argues that there is nothing in the record to support a finding that the hospital suffered an economic loss as a result of his conduct.

A.R.S. § 13–105(11) defines "economic loss" as "any loss incurred by a person as a result of the commission of an offense." Economic loss includes "losses which would not have been incurred but for the offense." "But for" Lopez' beating of Anthony, his mother would not have incurred the medical expenses in question. The fact that Anthony died does not extinguish the obligation for restitution. When the victim dies, the restitution is owed to the victim's family. A.R.S. § 13–603(C). Ordering that restitution be paid directly to the hospital rather than through the mother was within the trial court's discretion. A trial court may order restitution be paid to others who have indemnified victims for losses caused by criminal acts. *State v. Merrill*, 136 Ariz. 300, 301, 665 P.2d 1022, 1023 (App. 1983). The record shows that at the time of sentencing, the hospital bill of $1,995.70 was still outstanding.

Lopez' reliance on *State v. Monick*, 125 Ariz. 593, 611 P.2d 946 (App.1980), is misplaced. There, the trial court improperly ordered the defendant to pay restitution to the victim of an unrelated crime.

## SEARCH WARRANTS

Lopez argues that at the hearing on his motion to suppress the evidence obtained by search warrant from the apartment he shared with Anthony's mother, the trial court improperly precluded him from impeaching the statements made by Detective Millstone when he obtained the search warrant. In the affidavit executed to secure the search warrant, Detective Millstone stated that Anthony was brought to the hospital with multiple bruises on his face, chin, chest and back, as well as blood-filled eyes. Lopez wished to challenge the affidavit by introducing evidence of a discharge summary prepared after Anthony died, but dictated at the time the doctor made his observations of Anthony. The discharge summary would have shown that the doctor did not observe blood-filled eyes or bruises on the chest and abdomen when he first examined Anthony.

Lopez cannot challenge the truth of statements made in an application for a search warrant unless he alleges that those statements were deliberately, or at least recklessly, false. *Franks v. Delaware*, 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667, 682 (1978); *State v. Buccini*, 165 Ariz. 108, 110, 796 P.2d 910, 912 (App. 1990). Lopez has made no such allegation. Only when an allegation of deliberate or reckless falsity is made and proved by a preponderance of the evidence does the trial court excise those false statements and determine if sufficient evidence for probable cause to search exists without those statements. *Franks v. Delaware*, 438 U.S. at 171, 98 S.Ct. at 2684, 57 L.Ed.2d at 682; *State v. Carter*, 145 Ariz. 101, 108, 700 P.2d 488, 495 (1985).

In any event, the discharge summary was not probative of what the emergency room doctors *told* Detective Millstone. This verbal information formed the basis for the affidavit. The summary was prepared after Detective Millstone obtained the warrant, and Lopez' counsel never stated or proved that the summary was a complete listing of the injuries Anthony suffered. On appeal, the trial court's ruling on a motion to suppress evidence will not be disturbed absent clear and manifest error. *State v. Smith*, 136 Ariz. 273, 665 P.2d 995 (1983). No such error appears here.

## AGGRAVATED TERM FOR CHILD ABUSE

The trial court sentenced Lopez to an aggravated term of 22 years' imprisonment for the child abuse conviction. The trial court found as aggravating factors the in-

fliction of serious harm causing death, and the especially heinous, cruel or depraved manner in which the offense was committed. The trial court found no mitigating factors. Lopez' arguments on this issue will be considered in the discussion below concerning the imposition of the death penalty.

## CONSTITUTIONALITY OF A.R.S. § 13–1105(A)(2)

Lopez claims that A.R.S. § 13–1105(A)(2) is unconstitutional to the extent the statute makes child abuse under A.R.S. § 13–3623(B)(1) a predicate offense for felony-murder. However, his arguments on this issue are not based on constitutional protections. He relies instead on the doctrine of merger for which he cites *State v. Essman*, 98 Ariz. 228, 403 P.2d 540 (1965). Relying on *Essman*, Lopez argues that Arizona has limited the felony-murder rule under the doctrine of merger. The court in *Essman*, stated:

> The felony-murder doctrine does not apply where the felony is an offense included in the charge of homicide. The acts of assault merge into the resultant homicide, and may not be deemed a separate and independent offense which could support a conviction for felony-murder.

98 Ariz. at 235, 403 P.2d at 547. Lopez argues that child abuse is merely another form of assault distinguished only by virtue of the victim's age.

The merger rule developed in English common law because the procedure for prosecuting a felony was so different from prosecuting a misdemeanor that the two prosecutions could not be combined for trial. *R. PERKINS, CRIMINAL LAW* at 554 (2d ed. 1969); *C. TORCIA, WHARTON'S CRIMINAL LAW* § 24 at 111 (14th ed. 1985). Because a defendant could not be tried for both a felony and a misdemeanor at the same time, the misdemeanor was deemed to have merged into the felony. *R. PERKINS*, supra, at 618. For example, a misdemeanor charge of battery would merge into a felony charge of murder. *Id.* However, one felony did not merge into another felony, and one misdemeanor did not merge into another misdemeanor. *C. TORCIA*, supra, § 24 at 111–12. Lopez cites three Arizona cases in support of his merger argument, *State v. Hankins*, 141 Ariz. 217, 686 P.2d 740 (1984), *State v. Miniefield*, 110 Ariz. 599, 522 P.2d 25 (1974), and *State v. Essman*, supra, which we find distinguishable. In *Essman*, the trial court gave a second-degree felony-murder instruction that was rejected on appeal. The reason given for reversal was that the "felony-murder doctrine does not apply where the felony is an offense included in the charge of homicide. The acts of assault merge into the resultant homicide, and may not be deemed a separate and independent offense which could support a conviction for felony murder, ..." *Essman*, 98 Ariz. at 235, 403 P.2d at 545.

In addition, *Essman* failed to note that there was no second-degree felony-murder statute in Arizona, nor is there at this time; there were and are no common law crimes in Arizona; and, the legislature had enacted a felony-murder first-degree statute that did not include assault as a predicate offense. See *State v. Dixon*, 109 Ariz. 441, 511 P.2d 623 (1973).

In *Miniefield*, the defendant argued that his conviction for felony-murder/arson was improper because arson was merely the method he used to achieve his homicidal goal. 110 Ariz. at 601, 522 P.2d at 27. This court rejected the defendant's common law theory, noting that Arizona criminal law is based solely on statute. 110 Ariz. at 602, 522 P.2d at 28. Because the statute drew no distinction between a person who intends to kill another by fire and one who intends only to burn a dwelling and accidentally kills an occupant, the court held that it would not do so either. *Id.*

In *Hankins*, the state had charged the defendant with felony-murder/burglary. 141 Ariz. at 221, 686 P.2d at 744. The burglary alleged was the entering of a private home of the victim with the intent to commit assault. *Id.* Relying on *Essman*, the defendant argued that he could not be convicted of felony-murder because the burglary/assault merged with the homicide. *Id.* This court rejected Han-

kins' claim, concluding that "[W]hile a felonious assault does not itself warrant a felony murder charge, remaining unlawfully in a residence with the intent to commit an assault is a burglary and the burglary warrants a felony murder charge." *Id.*

Even those states that follow the merger doctrine recognize that, if the legislature explicitly states that a particular felony is a predicate felony for felony-murder, no "merger" occurs. *See State v. Prouse,* 244 Kan. 292, 297, 767 P.2d 1308, 1313 (1989); *State v. Lucas,* 243 Kan. 462, 471, 759 P.2d 90, 99 (1988); *see also State v. Hunter,* 35 Wash.App. 708, 713, 669 P.2d 489, 494 (1983) ("anti-merger" statute precludes the application of the merger doctrine). For example, although the Kansas Supreme Court held that, under Kansas law, child abuse merged with the homicide, it also noted the following:

> If additional protection for children is desired, the Kansas Legislature might well consider legislation which would make the death of a child occurring during the commission of the crime of abuse of a child, ..., first- or second-degree felony murder.

*Lucas,* 243 Kan. at 471, 759 P.2d at 99. Lopez has directed us to no impediment, nor can we conceive of any precluding the legislature from classifying child abuse that results in the death of the child as a predicate felony that triggers the felony-murder statute.

As adopted in the criminal code, it is the public policy of the state to condemn, correct or deter transgressions that harm either private or public interests. *State v. Bly,* 127 Ariz. 370, 621 P.2d 279 (1980); A.R.S. § 13-101. The power to define conduct that will not be tolerated in an ordered society and to provide punishment for those who engage in such conduct resides with the legislature. *State v. Hickey,* 114 Ariz. 394, 561 P.2d 315 (1977). We see no constitutional bar to the legislature's determination that the children of Arizona require additional protection by the state from child abuse.

Although Lopez supports his contention with case authorities from other states, the authorities are inapplicable in Arizona. Lopez first cites *People v. Smith,* 35 Cal.3d 798, 803, 201 Cal.Rptr. 311, 316, 678 P.2d 886, 891 (1984), in which the California Supreme Court held that child abuse "merged" into the homicide and consequently could not be used as a predicate felony for felony-murder. *Smith* is distinguishable because, although it deals with a second-degree murder statute, that statute did not enumerate specific predicate felonies as does our first-degree murder statute. A.R.S. § 13-1105(A)(2). In addition, the court in *Smith* concludes that the predicate felony alleged there, child abuse, will be an essential element in almost every second-degree murder case.

Comparing Arizona and California felony-murder law shows that California case law is not persuasive in this area. In California, burglary with the intent to commit an assault cannot be a predicate felony for felony-murder. *Smith,* 35 Cal.3d at 801, 201 Cal.Rptr. at 314, 678 P.2d at 889. Such a burglary can support felony-murder in Arizona. *Hankins,* 141 Ariz. at 221, 686 P.2d at 744. In California, kidnapping does not support felony-murder. *People v. Bigelow,* 37 Cal.3d 731, 742, 209 Cal.Rptr. 328, 339, 691 P.2d 994, 1005 (1984). But kidnapping is an enumerated felony under the Arizona felony-murder statute, A.R.S. § 13-1105(A)(2). Thus, *Smith* and other California case law is inapposite and does not support Lopez' contentions.

Likewise, Lopez' reliance on the Oklahoma decision of *Massie v. State,* 553 P.2d 186 (Okla.Cr.1976), is misplaced. Although the Oklahoma court held that child abuse could not be a predicate felony for felony-murder, Oklahoma statutory law at the time of the opinion precluded the Oklahoma equivalent of child abuse from being a predicate felony for felony-murder. 553 P.2d at 191, n. 3; *Campbell v. State,* 546 P.2d 276, 283 n. 1 (Okla.Cr.1976). The case law Lopez cites to support his contention is inapposite to his case under Arizona law. The Arizona legislature has specified that child abuse is a predicate felony for first-degree felony-murder, and whatever the virtue or lack thereof of the merger doc-

trine, it applies to lesser-included offenses, and child abuse is not a lesser-included offense of murder. Because child abuse does not merge into homicide, Lopez was properly charged with and convicted of first-degree murder under a felony-murder theory.

## FELONY–MURDER

Lopez argues that the trial court committed reversible error when it permitted the state to elect to proceed on the theory of felony-murder alone and withdraw the theory of premeditation. We note that when the state made this election, defense counsel acquiesced and raised no objection. Lopez claims error now because he was precluded from having the jury consider lesser-included offenses to first-degree murder.

Lopez cites *Beck v. Alabama*, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), which we find inapposite. *Beck*, not a felony-murder case, addressed Alabama's statutory scheme for capital offenses that "is unique in American criminal law" in that no lesser-included offense instructions could be given when a defendant was tried for a capital offense. 447 U.S. at 635, 100 S.Ct. at 2388, 65 L.Ed.2d at 401.

■ Choosing which offense to charge and prosecute is within the discretion of the prosecutor. *State v. Gooch*, 139 Ariz. 365, 678 P.2d 946 (1984). When conduct can be prosecuted under two or more statutes, the prosecutor has the discretion to determine which statute to apply. *State v. Williams*, 168 Ariz. 367, 813 P.2d 1376 (App.1991). Here, the prosecutor could have chosen not to bring a premeditated charge at all. We see no error.

## DEATH PENALTY

■ As in every death penalty case, this court must review the record and make an independent determination of whether the death sentence is appropriate. *State v. McMurtrey*, 136 Ariz. 93, 101, 664 P.2d 637, 645, cert. denied, 464 U.S. 858, 104 S.Ct. 180, 78 L.Ed.2d 161 (1983). The death penalty has been found appropriate for other felony-murder convictions. *State v. La-*

*Grand*, 153 Ariz. 21, 734 P.2d 563, cert. denied 484 U.S. 872, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987), and *State v. Tison*, 129 Ariz. 526, 633 P.2d 335 (1981), cert. denied, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147, reh'g denied, 459 U.S. 1024, 103 S.Ct. 391, 74 L.Ed.2d 520 (1982). We review the aggravating and mitigating circumstances found by the trial court to ensure they were properly determined and weighed. *State v. LaGrand, supra.*

■ The trial court found two aggravating factors: (1) the murder was committed in an especially heinous, cruel or depraved manner under A.R.S. § 13–703(F)(6); and, (2) Lopez, an adult, committed the offense on a victim under 15 years of age. A.R.S. § 13–703(F)(9). The terms "cruel," "heinous" or "depraved" are stated in the disjunctive; any one of them individually may constitute an aggravating circumstance. *Amaya–Ruiz*, supra; *State v. Carriger*, 143 Ariz. 142, 692 P.2d 991 (1984), cert. denied, 471 U.S. 1111, 105 S.Ct. 2347, 85 L.Ed.2d 864 (1985); *State v. James*, 141 Ariz. 141, 685 P.2d 1293, cert. denied, 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 332 (1984).

■ A murder is especially cruel if the victim consciously experienced physical or mental pain and suffering prior to dying. *Amaya–Ruiz*, 166 Ariz. at 177, 800 P.2d at 1285; *State v. Fulminante*, 161 Ariz. 237, 254, 778 P.2d 602, 609 (1988), cert. denied, 494 U.S. 1058, 110 S.Ct. 1528, 108 L.Ed.2d 768 (1990). A doctor who had reviewed the hospital records and the autopsy report testified as to the pain Anthony must have suffered from the numerous injuries inflicted on him. The doctor, board certified in pediatrics and in trauma and emergency room medicine, had also spent four years in residency in child abuse. He testified that the skull fractures, especially the one where a piece of the child's skull was driven into his brain, would have caused Anthony "an excessive amount of pain." He stated that the abdominal injuries, the torn pancreas and bowel would have been very painful, "like somebody performing surgery without anesthesia." Anthony was conscious and felt this pain for at least 45

minutes before he slipped into a coma. Anthony must also have suffered some mental anguish while he remained conscious, knowing that one of the two people he depended on and trusted to care for and love him had beaten him repeatedly about the head and body and did nothing to stop the pain and comfort him. We believe the trial court correctly found that Lopez murdered Anthony in an especially cruel manner.

■ The other two factors, heinousness and depravity, focus on the murderer's state of mind at the time of the murder. *Amaya–Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286; *Fulminante*, 161 Ariz. at 255, 778 P.2d at 620.

■ Five factors are looked at to determine whether a murderer acted in a heinous or depraved manner: (1) the murderer's relishing of the murder; (2) the infliction of gratuitous violence on the victim beyond that necessary to commit the murder; (3) the needless mutilation of the victim; (4) the senselessness of the murder; and, (5) the helplessness of the victim. *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11, cert. denied, 461 U.S. 971, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). Although the factors of senselessness and helplessness of the victim need not always, by themselves, justify a finding that the murder was heinous or depraved, they do inform the trial court of the defendant's mental state. Id. at 52–53, 659 P.2d at 11–12.

■ The murder of Anthony was senseless. Lopez admitted that after he had given Anthony a bath and was putting lotion on him, the infant "peed, so I smacked him." While such a reaction might be excused as a momentary flash of anger, the continued beating Anthony received, as evidenced by the extent of his injuries, bespeaks a "shockingly evil" mind and constitutes heinous conduct. *Amaya–Ruiz*, 166 Ariz. at 178, 800 P.2d at 1286. We can conceive of no act more senseless than beating a one-year-old child to death.

Anthony was clearly helpless and unable to defend himself from the blows inflicted by Lopez and unable to seek aid for his injuries. The one person who could have sought medical help for Anthony, Lopez, took pains to make it appear that an accident had occurred. In addition, when Anthony's mother returned to the apartment and wanted to take Anthony to the hospital, Lopez refused. While Lopez attempted to conceal the beating he had administered, Anthony lay on the couch in pain, suffering seizures, according to the medical testimony, as a result of the injuries to his brain. According to the medical testimony, if Anthony had been brought to the hospital sooner, he might have lived. Lopez' decision to protect himself at the expense of the life of his one-year-old son is the essence of depravity.

We believe the record amply supports a finding that Lopez was in a heinous and depraved state of mind when he beat Anthony. The trial court did not err in finding the aggravating circumstance that the murder was committed in an especially cruel, heinous, or depraved manner. *A fortiori*, the same injuries and conduct support a finding that the child abuse was also committed in a similar manner. The trial court did not err in sentencing Lopez to an aggravated term of imprisonment for the child abuse conviction. Lopez also argues that imposition of the death penalty was improper because the trial court did not list all the mitigating circumstances he offered and did not explain the reasons for rejecting them. Lopez relies on our statement in *State v. Leslie*, 147 Ariz. 38, 708 P.2d 719 (1985), that the better practice is for the trial court to place on the record a list of all factors offered in mitigation and then explain the court's reasons for accepting or rejecting them, so that it is clear to the reviewing court that the trial court has considered all mitigating circumstances prior to sentencing. The record before us clearly indicates that the trial judge considered all the mitigating factors presented by Lopez. Prior to sentencing, the trial judge stated:

> For the record, the Court has read the presentence report, the letters and other documents submitted by the defendant in the time period since the verdict was entered—largely since the presentence

was prepared and filed, as well as this Court's having heard the trial and the aggravation/mitigation hearing on May the 10th, 1990.

The trial judge further stated: "The Court finds no mitigating factors as set forth in 13–703(G). The Court has considered all evidence presented by the defendant by way of mitigation." The vast majority of the mitigation evidence presented by Lopez centered on his being a good parent and on the fact that he cared for children and never acted inappropriately with them. However, the trial court had before it the record of Lopez' conviction for child molestation, a class 2 felony. Lopez was arrested for child molestation in December 1988. Anthony was murdered in August 1989. In May 1990, 10 days before sentence was pronounced in this case, Lopez was sentenced to a 22–year term of imprisonment for the child molestation conviction.

 A defendant has the burden of proving mitigating factors by a preponderance of the evidence. *State v. McMurtrey*, 143 Ariz. 71, 72–73, 691 P.2d 1099, 1100–01 (1984), cert. denied, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987). The trial court may take cognizance of evidence tending to refute a mitigating circumstance. *State v. Poland*, 144 Ariz. 412, 415, 698 P.2d 207, 210 (1985). We believe the trial court could properly find that the record refuted the proffered mitigating circumstances.

██ Appellant argues that a proportionality review is required in all death penalty cases. Such a review is no longer necessary. *State v. Salazar*, 173 Ariz. 399, 844 P.2d 566 (1992).

We have reviewed the record for fundamental error pursuant to A.R.S. § 13–4035, *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon*, 104 Ariz. 297, 451 P.2d 878 (1969), and have found none. We affirm Lopez' conviction for child abuse, a class 2 felony, and the trial court's sentence of an aggravated term of 22 years' imprisonment based on that conviction. We also affirm Lopez' conviction for first-degree murder

and the trial court's sentence of death based on that conviction.

MOELLER, V.C.J., and CORCORAN, J., concur.

Note: Justice FRANK X. GORDON, Jr., Retired, did not participate in this decision. Pursuant to Ariz. Const. art. 6, § 3, the Honorable JAMES D. HATHAWAY, Judge of the Arizona Court of Appeals, Division Two, was designated to sit in his stead.

FELDMAN, Chief Justice, specially concurring.

I concur with the result reached by the court and with its analysis, except with respect to the question of compliance with the statutory requirement for findings. In a death case the court must make a "special verdict setting forth its findings as to the existence or nonexistence of each of the circumstances set forth in subsection (F) of this section [statutory aggravating circumstances] and as to the existence of any of the circumstances included in subsection (G) [mitigating circumstances] of this section." A.R.S. § 13–703(D).

In passing on the question of whether to impose death or a life sentence, the court is required to consider both the aggravating and mitigating circumstances. A.R.S. § 13–703(E). Among the mitigating circumstances that must be considered and on which findings are required under § 13–703(D) are "any of the circumstances of the offense." A.R.S. § 13–703(G). The most relevant circumstance, under the facts of this case, is the possibility that Defendant may never have formed an intent to kill. At oral argument, in fact, the prosecution effectively conceded that there was little or no evidence of intent to kill and that the most probable explanation for the child's death was that Defendant became enraged, lost control, and beat the child quite seriously. The prosecutor also conceded that a lack of intent to kill would be a mitigating factor but argued that it did not outweigh the aggravating factors. That weighing process, of course, was for the trial court. We must ask, therefore, what the trial court found regarding Defendant's intent.

Despite the special verdict and finding requirement of A.R.S. § 13–703(D), the trial judge did not state her findings on Defendant's intent and its effect, if any, on the consequent weighing of mitigating versus aggravating factors. We have held that § 13–703(D) does not require the trial court to compile a laundry list of every possible item of mitigating evidence. *State v. McCall*, 160 Ariz. 119, 125, 770 P.2d 1165, 1171 (1989) (citing *State v. Leslie*, 147 Ariz. 38, 50, 708 P.2d 719, 731 (1985)), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990). Nevertheless, if the statute is to be given any meaning, it should be interpreted to require, at the least, that the trial court make findings on the most important, relevant issues raised by the evidence.

In the present case, the trial judge made only the non-specific statement that she had "considered all the evidence...." No doubt this is true, though it is rare for a trial judge to admit to having failed to consider all of the relevant evidence. The problem is that we do not know what evidence the trial judge thought relevant or, if she made any finding on intent, how she weighed it. Defendant's intent was the main factual issue in the sentencing phase of the case. Absent a finding on this issue, I believe this court is unable to perform its independent duty of review. I would therefore affirm the conviction and remand for findings on the question of intent to kill. At that point, and at that point only, will it be possible to determine on review the weighing of aggravating and mitigating circumstances. *See, e.g., Richmond v. Lewis*, — U.S. —, 113 S.Ct. 528, 121 L.Ed.2d 411 (1992).

I am authorized to state that Justice CAMERON (retired) agrees with these views.